**EXCAVATION TECHNOLOGIES,
INC., Appellant**

v.

**COLUMBIA GAS COMPANY OF
PENNSYLVANIA, Appellee.**

Superior Court of Pennsylvania.

Argued March 21, 2007.
Filed Nov. 7, 2007.

Allan J. Fluke, Danny P. Cerrone and Richard W. Saxe, Jr., Pittsburgh, for appellant

Walter T. McGough, Jr., Pittsburgh, for appellee.

BEFORE: FORD ELLIOTT, P.J., ORIE MELVIN, LALLY–GREEN *, TODD, KLEIN, BENDER, BOWES, GANTMAN and PANELLA, JJ.

OPINION BY ORIE MELVIN J.:

¶ 1 Appellant, Excavation Technologies, Inc. (ETI), appeals from the order of the Washington County Court of Common Pleas sustaining preliminary objections filed by Appellee, Columbia Gas Company of Pennsylvania (Columbia Gas), and dismissing its complaint. ETI asks us to determine whether it has stated a viable cause of action for negligent misrepresentation under Section 552 of the Restatement (Second) of Torts, as adopted by our Supreme Court in *Bilt–Rite Contractors, Inc. v. Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005), despite not having suffered physical injury or property damage. We find that it has not and, therefore, affirm.

¶ 2 The relevant facts and procedure underlying this suit may be summarized as follows. ETI is an Ohio contractor in the business of providing excavation services. ETI was hired to perform excavation work for a waterline extension project in North Bethlehem Township, Washington County, Pennsylvania from September 11, 2002 until January 31, 2003. ETI alleges in its two count complaint, sounding in negligence and breach of contract, that pursuant to the One Call Act [1] it timely requested Columbia Gas to mark any gas lines in the vicinity of the various work sites. Further, ETI alleges that Columbia Gas marked several lines improperly and, in some instances, did not mark lines at all. As a consequence, ETI struck gas lines on eleven separate dates resulting in a damage claim of $74,502.06 [2] consisting of a total of 47 hours of downtime for its manpower and equipment.

¶ 3 Prior to the instant complaint, ETI and Columbia Gas sued and countersued each other in the Lawrence County Court of Common Pleas. In the Lawrence County court's opinion, filed on March 11, 2004, the trial court sustained preliminary objections against ETI and dismissed its counterclaim. [3] On September 9, 2004, ETI filed the instant complaint against Columbia Gas in the Washington County Court of Common Pleas. Columbia Gas filed preliminary objections in the nature of a demurrer, upon which the trial court heard oral arguments. Following arguments, the trial court sustained the objections on June 30, 2005 and dismissed the complaint with prejudice finding that a claim for negligent misrepresentation cannot lie where the losses alleged are solely economic in nature. The trial court also determined that

---

* Judge Lally–Green did not participate in the consideration or decision of this matter.

1. *See generally,* 73 P.S. §§ 176–186.

2. In its initial brief, ETI avers the amount of damages sought in the complaint was incorrect and that the correct amount is $90,288.64.

3. The record does not reveal the circumstances surrounding this complaint or the result of the claim filed by Columbia Gas against ETI.

privity did not exist between the parties. This timely appeal followed.

■ ¶ 4 The sole issue for our consideration is whether ETI has stated a viable cause of action against Columbia Gas for purely economic damages under a negligent misrepresentation theory pursuant to Section 552(1) and (2) of the Restatement (Second) of Torts for allegedly failing to comply with its obligations under the One Call Act.[4]

¶ 5 Our well-settled scope and standard of review are as follows:

A preliminary objection in the nature of a demurrer is properly granted where the contested pleading is legally insufficient. Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true.

In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case if free and clear of doubt.

*Hess v. Fox Rothschild, LLP,* 2007 PA Super 133, ¶ 18, 925 A.2d 798 (2007) (internal quotation marks and citations omitted).

¶ 6 ETI and their amici curiae[5], contend that facility owners, such as Columbia Gas, fall within the exception to the economic loss rule set forth in Section 552 of the Restatement (Second) of Torts, which was adopted by our Supreme Court in *Bilt–Rite, supra.* Specifically, ETI submits that since Columbia Gas is under a statutory duty to provide information concerning the location of their underground lines it should be subject to liability for negligently supplying that information in the same manner as the architectural firm was held subject to liability for economic losses in *Bilt Rite.* Columbia Gas counters that "[u]tility companies responding as compelled by the One Call Act cannot be equated with design professionals who are engaged to prepare plans, drawings, and specifications and do so for their own pecuniary gain." Substitute Brief of Appellee on Reargument En Banc, at 7. Furthermore, Columbia Gas along with its amicus curiae, the Energy Association of Pennsylvania, assert that the expansion of tort liability as advocated by ETI "would be contrary to the policy considerations that underlie tort law. Most significantly, im-

---

4. We note that ETI does not challenge the order sustaining preliminary objections as to its breach of contract claim.

5. The Pennsylvania Utility Contractors Association, the National Utility Contractors Association, the Associated Pennsylvania Constructors, the Associated Builders and Contractors of Western Pennsylvania, and the Pennsylvania Associated Builders and Contractors, Inc. filed a brief of Amici Curiae in support of ETI, which merely tracks the same arguments advanced by ETI. Thus, we will only refer to ETI in discussing the arguments.

posing liability for purely economic losses on utility companies is contrary to the One Call Act—which defines the parties' relationship and their respective obligations and rights—and would thwart the Act's purposes." *Id.* at 7–8. We find Columbia Gas' arguments persuasive.

¶ 7 Section 552 of the Restatement (Second) of Torts, entitled "Information Negligently Supplied for the Guidance of Others," provides, in relevant part, as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1977).

¶ 8 In *Bilt–Rite*, a school district entered into a contract with an architectural firm, pursuant to which the firm designed a new school. The school district solicited bids from contractors for all aspects of the project and included the firm's plans, drawings, and specifications in the bid documents supplied to the contractors. Based upon this information, the contractor submitted a bid which was accepted. During construction, the contractor discovered that the firm's specifications were wrong and caused large cost overruns. The contractor instituted suit against the architect for negligent misrepresentation. The trial court found no privity existed between the architect and the contractor and dismissed the claim. On appeal to this Court, we affirmed.

■■■ ¶ 9 Upon further appeal, our Supreme Court, after weighing the *Althaus*[6] factors to determine whether a duty existed in the architect/contractor scenario, held that privity was not a prerequisite for maintaining an action under § 552, and since there is no privity requirement "the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552." *Bilt–Rite*, at 484, 866 A.2d at 288. In adopting the Section 552(1) and (2) formulation as part of Pennsylvania tort law the Supreme Court noted that such adoption "would not supplant the common law version of the Pennsylvania tort, but rather, would serve to clarify the elements of the tort as they apply to those in the business of supplying information to others for pecuniary gain." *Id.* at 470, 866 A.2d at 280. Consequently, for common law negligent misrepresentation claims the

---

6.  *See Bilt–Rite Contractors, Inc. v. Architectural Studio,* 581 Pa. 454, 472, 866 A.2d 270, 281 (2005) (quoting *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000)) (stating "The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.").

economic loss rule still applies.[7]

¶ 10 In holding Section 552 applicable to "architects and other design professionals" our Supreme Court found persuasive the rationale expressed by the Court of Appeals of North Carolina in *Davidson and Jones, Inc. v. County of New Hanover*, 41 N.C.App. 661, 255 S.E.2d 580 (1979), *cert. denied*, 298 N.C. 295, 259 S.E.2d 911 (1979), wherein the *Davidson* court stated:

> An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects. . . . Where breach of such contract results in foreseeable injury, economic or otherwise, to persons so situated by their economic relations, and community of interests as to impose a duty of due care, we know of no reason why an architect cannot be held liable for such injury. Liability arises from the negligent breach of a common law duty of care **flowing from the parties' working relationship.** Accordingly, we hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably **resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner.**

*Bilt–Rite*, at 480–481, 866 A.2d at 286 (quoting *Davidson*, 255 S.E.2d at 584) (emphasis added). A design professional is typically responsible for the preparation of plans and specifications (information) that are supplied to and used by potential bidders in formulating a bid for a project.

Additionally, a design professional may make representations to the contractor while performing administrative responsibilities, which are either assumed or specifically made a part of his or her contract with the owner. The design professional is paid a fee for using his or her skills and training to provide information that is relied on by others prior to and during construction. If the plans and specifications prove to be erroneous, the contractor is at grave risk of suffering economic loss. Under these circumstances, it is quite clear that the design professional is supplying information in his or her professional capacity, as part of his or her business, for the guidance of others in a business transaction. Furthermore, a design professional's negligent misrepresentation could injure a third party in a variety of ways. Accordingly, the Supreme Court had little trouble reaching the conclusion that the requirements of section 552(1) are met under these circumstances. This was a logical conclusion because there are numerous tasks performed by the design professional on a typical project that support the conclusion that he or she is in the business of supplying information.

¶ 11 Thus, to establish liability under Section 552 of the Restatement (Second) of Torts a plaintiff must show, pursuant to subsection (1), that: the defendant is in the business of supplying information for the guidance of others and the information provider must have a pecuniary interest in the transaction; the information provided is false; the information was justifiably relied upon; and the defendant failed to exercise reasonable care in obtaining or

---

7.  The economic loss rule states that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa.Super.2003). In other words, the basic non-liability of the economic loss rule of *Robins Dry Dock, infra,* now reflected in Section 766C of the Restatement (Second) of Torts, instructs that without physical harm to either the person or the property of the plaintiff, *i.e.,* some physical impact, the plaintiff does not recover for a defendant's negligence.

communicating the information. Subsection (2) serves to limit the scope of such liability to those persons (a) the information provider knows exist, (b) who are contemplating a specific commercial transaction the information provider knows about, and (c) whom the information provider intends to influence in that transaction by using the provider's information.

¶ 12 A comparison of the facts presented in *Bilt–Rite* to those alleged in the instant complaint reveals that Section 552 is inapplicable to the current dispute. ETI's complaint fails to state a claim within the parameters of Section 552(1) and (2) because Columbia Gas, a public utility, is not a defendant who is akin to the architect in *Bilt–Rite* who was a professional information provider. The relationship between utilities and contractors bears no resemblance to the relationships discussed in *Bilt–Rite*. As Columbia Gas points out:

Architects have months or years to prepare detailed plans and drawings, typically have detailed information about the project, get paid for their services, and decide what projects to take and with whom and for whom they will work. By contrast, utilities are compelled by law to respond to all requests within just two working days and without remuneration. And, the requests are not few and far between....

Reply Brief of Appellee on Reargument En Banc, at 4. A facility owner under the Act does not engage in supplying information to others for pecuniary gain. Nor do they have any other interest or relationship to the parties involved in the transaction, here a waterline extension project, which necessitates the excavation.

¶ 13 We view the Supreme Court's adoption of Section 552 as drawing a narrow exception to the application of the economic loss rule in the particular set of circumstances that were present in *Bilt–Rite*. The Supreme Court made clear in its rationale that application of Section 552 liability for economic loss was limited to design professionals, such as architects, because they have a contractual relationship with some party to the construction project, typically the owner, from which a duty flows to foreseeable third parties to that contract. *See Davidson*, 255 S.E.2d at 584 (holding that "an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner."). A utility responding pursuant to its obligations under the One Call Act stands on a completely different footing than that of an architect, or other design professional, as its only contractual relationship with any party to the project is to supply gas to its customers, not information for the guidance of others in their business. The obligation to supply information to excavators is a statutorily created duty. While the information supplied may indeed provide ETI with guidance in its business, Columbia Gas does not receive any payment for that information and the main purpose for the creation of the duty is protective in nature as to both the public generally and the facility owner's lines. *See* Act of December 10, 1974, P.L. 852, No. 287 (stating "An Act to protect the public health and safety by preventing excavation or demolition work from damaging underground lines used in providing electricity, communication, gas, oil delivery, oil product delivery, sewage, water or other service; imposing duties upon the providers of such service, recorders of deeds, and persons and other entities preparing drawings or performing excavation or demolition work; and prescribing penalties."). Consequently, we find that Columbia Gas does not

provide information for pecuniary gain or engage in a commercial transaction when it responds under the One Call Act. As such, ETI's claim fails to satisfy the first element for a negligent misrepresentation action under Section 552(1), and, hence, the economic loss rule is still applicable to preclude a common law negligent misrepresentation cause of action.

¶ 14 In support of the viability of its claim, ETI relies on cases from the only two jurisdictions that have allowed causes of action for purely economic damages against utility companies for failure to properly mark the locations of their lines upon receiving notification that excavation work was planned in the vicinity of utility lines. In *Followell v. Central Ill. Pub. Serv. Co.*, 278 Ill.App.3d 1103, 215 Ill.Dec. 608, 663 N.E.2d 1122 (5th Dist.1996), *appeal denied*, 168 Ill.2d 588, 219 Ill.Dec. 563, 671 N.E.2d 730 (1996), the plaintiff sought reimbursement from the defendant for downtime costs and lost profits incurred as a result of the defendant's alleged mislocation and mismarking of its utility lines. Although recognizing that purely economic damages generally are not recoverable in tort actions, the Illinois court found that under the Illinois version of the One Call Act (titled as "Underground Facilities Damage Prevention Act"), the legislature intended to create a cause of action for purely economic damages when it provided for a finding of a facility owner's prima facie negligence in cases where the facilities are mislocated. In *Followell*, the applicable provision provides as follows:

Sec. 9. When it is shown by competent evidence in any action for damages to underground utility facilities or CATS facilities that such damages resulted from excavation or demolition and that the person engaged in such excavation or demolition failed to comply with the provisions of this Act, that person shall be deemed prima facie guilty of negligence. When it is shown by competent evidence in any action for damages to persons, material or equipment brought by persons undertaking excavation or demolition acting in compliance with the provisions of this Act that such damages resulted from the failure of owners and operators of underground facilities or CATS facilities to comply with the provisions of this Act, those owners and operators shall be deemed prima facie guilty of negligence.

220 ILCS 50/9 (West 2007).

¶ 15 Similarly, in *A & L Underground, Inc. v. City of Port Richey*, 732 So.2d 480 (Fla. 2d DCA 1999), A & L sued Port Richey for statutory violations of the Florida Underground Facility Damage Prevention & Safety Act. Port Richey argued, and the trial court ruled, that A & L could only recover damages for personal injuries or property damage under the Act. This Act provides, in relevant part, that:

If, after receiving proper notice, a member operator fails to discharge a duty imposed by the provisions of this act and an underground facility of such member operator is damaged by an excavator who has complied with the provisions of this act, as a proximate result of the member operator's failure to discharge such duty, such excavator shall not be liable for such damage and the member operator, if found liable, shall be liable to such person for the total cost of any loss or injury to any person or damage to equipment resulting from the member operator's failure to comply with this act.

*Id.* at 481 (citing § 556.106(3), Fla. Stat. (1995)). On appeal, the Florida Appeals Court for the Second Circuit, in a one paragraph opinion, summarily concluded that the clear language of section 556.106(3) allows recovery for purely eco-

nomic losses by relying on the language "for the total cost of any loss." *Id.* (citing *Followell*).

¶ 16 Unlike the Illinois and Florida statutes, the Pennsylvania One Call Act does not provide for a private cause of action for negligence. The One Call Act provides for criminal penalties in the form of fines for certain violations of the Act and states that its provisions "shall not affect any civil remedies for **personal injury or property damage,** except as otherwise specifically provided for in this act." 73 P.S. § 182.2(a) and (e) (emphasis added). The specific exceptions in the Act only speak in terms of relieving excavators from liability for personal injury or property damage to a facility owner's lines or reducing a facility owner's right of recovery for damage to its lines where the excavator has complied with the Act and is not otherwise negligent. *See* 73 P.S. § 180(12)(i) and (ii). Nowhere in the Act does it state that there is a right to recover economic damages (in the form of cost overruns in its contract with the project's owner) for failure to comply with the duties imposed by the Act. Nor is there any language similar to that found in the Florida Statute concerning liability "for the total cost of any loss." Moreover, we are not persuaded that those courts properly interpreted the language of their statutes in reaching such a result.

¶ 17 We reject the expansive reading of the statutes employed in *Followell* and *A & L.* The Illinois statute in *Followell* specifically states that the facility owners who fail to comply with the act will "be deemed prima facie guilty of negligence" in an "action for damages to persons, material or equipment." Similarly, the Florida statute in *A & L* speaks to recovery "for the total cost of any loss **or injury to any person or damage to equipment.**" To focus only on the preceding language of "total cost of any loss" in *A & L*, or the

language establishing "prima facie negligence" in *Followell,* does not do justice to the intent of the legislation. The Florida statute also provides that:

It is the intent of the Legislature to provide access for excavating contractors and the public to provide notification to the system of their intent to engage in excavation or demolition. This notification system shall provide the member operators an opportunity to identify and locate their underground facilities. Under this notification system, Sunshine State One–Call of Florida, Inc., is not required or permitted to locate or mark underground facilities. It is the purpose of this chapter to:

Aid the public by preventing injury to persons or property and the interruption of services resulting from damage to an underground facility caused by excavation or demolition operations.

§ 556.101(2) and (3)(a), Fla. Stat. (2007); *see also,* 220 ILCS 50/1 (2007) (describing the Title as follows: "An Act relating to the prevention of negligent or unsafe excavation or demolition operations for the protection of persons and property and the preservation of utility services."). The statutory language in both the Illinois and Florida statutes seem at most to contemplate personal injury damages, out-of-pocket losses and economic losses that are confined to damage to equipment. This reading seems most consistent with the expressions of legislative intent in the statutes involved in *Followell* and *A & L,* as well as the Pennsylvania statute.

■ ¶ 18 Alternatively, ETI advocates for application of subsection (3) of 552, in order to subject Columbia Gas to liability in this action. This subsection provides as follows:

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class

of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them. Restatement (Second) of Torts § 552 (1977). ETI maintains that this subsection is applicable because Columbia Gas is under a public duty to provide information as to the location of its underground gas lines. Thus, according to ETI, when Columbia Gas supplies inaccurate or no information in response to a request under the One Call Act it violates its public duty to the excavator, who is a member of the class of persons for whose benefit the duty was created.

¶ 19 Initially, we note that our Supreme Court did not adopt this subsection in *Bilt–Rite* as it was not implicated under the facts presented in that case. *See Bilt–Rite, supra* at 459 n. 1, 866 A.2d at 273 n. 1 (stating, "Subsection (3) is not at issue in this case and we offer no view on whether it has any place in Pennsylvania law."). Nonetheless, ETI invites this Court to break new ground and adopt this subsection. We decline the invitation.

¶ 20 In determining whether a duty of care exists in a particular context we are guided by the *Athaus* factors, *supra* n. 6. Furthermore, in making this inquiry "it must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' **from the harm suffered[.]**" *Id.* at 552, 756 A.2d at 1168–1169 (emphasis added). Additionally, since a statute defines the relationship of these parties we must examine the legislative intent, keeping in mind that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." *Carrozza v. Greenbaum,* 591 Pa. 196, 214, 916 A.2d 553, 564 (2007) (quoting 1 Pa.C.S.A. § 1921(a)). As previously dis-

cussed, our General Assembly did not see fit to provide for a private cause of action for economic loss under the Act. The liability-limiting principle embodied in the economic loss rule was well established in tort law at the time the One Call Act was enacted. *See Aikens v. Baltimore & Ohio R. Co.,* 348 Pa.Super. 17, 501 A.2d 277, 278–279 (1985) (stating that "[t]he roots of this well-established rule reach back to the United States Supreme Court decision of *Robins Dry Dock and Repair Company v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927)."). Furthermore, by the time the Act was amended in 1986 to add the provision describing the extent to which common law rights and remedies remained viable, the economic loss rule was formally adopted in this Commonwealth. *See id.* (adopting the majority rule that no cause of action exits for negligence that causes only economic losses). Thus, this Court must assume that the General Assembly was aware of the economic loss rule when it established the statutory scheme that governs the relationships among the entities required to participate in the One Call System. Accordingly, there was no reason to expressly preclude recovery for economic loss. *See In re Rodriguez,* 587 Pa. 408, 415, 900 A.2d 341, 345 (2003) (stating that courts "must assume that the General Assembly understands the legal landscape upon which it toils" and thus when the legislature does not "abrogate the common-law rule, [the Act] must be understood to have retained it."); *Commonwealth v. Miller,* 469 Pa. 24, 28, 364 A.2d 886, 887 (1976) (stating "statutes are not presumed to make changes in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions."). Consequently, we should be and are reluctant to disturb the well-established principles of the economic loss rule in the absence of express direction from the legislature.

¶ 21 As noted by our Supreme Court, Section 552(3) "typically" applies to governmental entities and "may" apply to certain non-governmental entities "who are required by law to provide information for the protection of **segments of the population** like insurance companies who must file certain financial information with the insurance commissioner, which information may be relied upon by potential insureds." *Bilt–Rite*, at 459, 866 A.2d at 273 (emphasis added). The One Call Act is not such a law; its purpose is not to protect excavators or designers from incurring economic losses in carrying out their contractual undertakings. Simply stated, the risk of delayed completion of an excavation contract is not the type of harm the One Call Act seeks to prevent. Quite the contrary, the One Call Act's purpose is to provide a centralized system of notification to protect against the potential types of harm immediately occasioned by a breach of underground lines, *i.e.*, disruption of service to the public and physical harm to those involved or in the vicinity of the digging as well as property damage to the lines, machinery, and buildings in the vicinity.

¶ 22 It is important to note that the Act not only establishes duties for the utilities and excavators but also for "designers" and "project owners." [8] The relationship between these parties and their respective rights, duties, and available remedies are comprehensively spelled out in the Act. The social utility in providing accurate location of underground lines for the protection of the public in general and the operators of the excavation is obvious; however, the benefits of subjecting utility companies to liability for economic harm occasioned by an inaccurate response or failure to respond to a One Call request is not so patent. When viewed in the context of the purpose of the Act the social utility is not increased by such an extension of liability. If the operator conducting the excavation or any other person is injured or property damaged as a result of a utility company's negligence the injured party has resort to civil remedies for personal injury or property damage. 73 P.S. § 182.2(e). The Act, in addition to subjecting violators to fines, further provides for a limited right to recover economic damages but only from the project owner. Specifically, if a utility provides "insufficient information" to enable an excavator to identify the precise location without employing additional "prudent techniques," the excavator can seek reimbursement from the project owner for the cost of that work. 73 P.S. § 180(4). Under these circumstances, "the excavator shall promptly notify the project owner ... [and, then] shall be entitled to compensation from the project owner for this additional work as provided in the latest edition of the Pennsylvania Department of Transportation Form 408 specifications for extra work performed on a force account basis." 73 P.S. § 180(15). Expanding the reach of the Act to include liability for economic harm will not substantially enhance the utility company's incentive to perform its statutory duties more diligently. Given the purpose of the Act and its concomitant rights, duties, and remedies, we find the relationship between the parties weighs against imposition of an extension of tort liability for economic losses not specifically provided for in the Act.

¶ 23 We further find that the consequences of imposing such a duty on Co-

---

**8.** " 'Designer' means any architect, engineer or other persons who or which prepares a drawing for a construction or other project which requires excavation or demolition work...." " 'Project owner' means any person who or which engages an excavator for construction or any other project which requires excavation or demolition work." 73 P.S. § 176.

lumbia Gas, and the overall public interest in doing so, weigh against imposition of further liability in this context. While an excavator's breach of an underground line that does not result in physical harm may cause some delay in completing the project, recovery for such "down time" is, nonetheless, not the type of circumstance in which public policy would be furthered through the imposition of tort liability. The burdens of guarding against such damage would be very great. Permitting recovery for purely economic loss under the circumstances of this case could expand the potential pool of plaintiffs beyond reason.[9] This cannot be the result intended by passage of the One Call Act.

¶ 24 If utility companies are exposed to liability for economic losses in this context those costs will more than likely be passed on to their customers. Permitting recovery for excavators, designers, or project owners for a utility's inaccurate marking of its lines would unreasonably shift the burden of risks away from those parties that can contractually provide for such risks and place the economic risk for delay in completing the project on the only party not involved in the project's contractual negotiations. See Cucchi v. Rollins Protective Servs. Co., 524 Pa. 514, 534, 574 A.2d 565, 576 (1990) (Nix, J., concurring) (noting that the objective of tort law "is to modify a course of behavior through the allocation of financial risk upon the party in the best position to prevent the harm."). In essence, we would be protecting the private interests of entities who are fully capable of protecting themselves at the expense of the public. Moreover, this Court has consistently expressed reluctance to judicially expand tort liability on public policy grounds as such is properly the role of the legislature. See Wapner v. Somers, 428 Pa.Super. 187, 630 A.2d 885, 886 (1993), appeal denied, 538 Pa. 636, 647 A.2d 511 (1994) (stating the "legislature [is] better able to weigh the costs to society" in expanding tort duties and "would also be able to set limits as to the amount and types of claims which could be brought."). Therefore, we decline ETI's invitation to legislate from the bench by interjecting into the Act an extension of liability beyond its intendment, and instead reject an extension of liability for purely economic losses for utility companies responding under the One Call Act. On balance, we find that these factors do not call for imposing a common law duty of care in these circumstances. Accordingly, the trial court properly sustained the preliminary objections of Columbia Gas in dismissing the complaint.

¶ 25 Order affirmed.

¶ 26 Ford Elliott, P.J., Todd and Panella, JJ., concur in the result.

¶ 27 Klein, J. files a dissenting opinion.

DISSENTING OPINION BY KLEIN, J.:

¶ 1 I respectfully dissent. It is clear under Pennsylvania's One Call Act (the Act) that in order for Columbia Gas to do business it had the obligation to supply proper information with regard to marking its gas lines. Therefore, I would find that ETI has stated a viable cause of action for

---

9. Take for example the same facts herein but instead of ETI breaching gas lines imagine that it cut cables belonging to the public utility which delivers electricity to a factory. The resultant black-out lasts for two days and causes the loss of two days of production at the factory. The factory then lays off a number of workers it had hired on a day-to-day basis. Can the laid off workers now seek compensation from either ETI or the utility company for the loss of two days' pay? The chain of events leading to economic losses is only limited by one's imagination.

negligent misrepresentation, pursuant to section 552(3) of the Restatement (Second) of Torts, where its claim is solely for economic damages due to Columbia's mis/malfeasance under the Act. In short: (1) Columbia had a statutory public duty under the Act to supply information to the One Call Center; (2) the information was procured to benefit a class of persons (i.e., contractors) such as ETI; and (3) ETI suffered losses as a result of Columbia's breach of its statutory duty. *See* Restatement (Second) of Torts, § 552(3).

¶ 2 In addition, permitting ETI to proceed with its claim for economic damages not only furthers the public policy underlying the Act, but also increases the incentive for a utility company to comply with its statutory duty of providing accurate information in the course of its business so that designated third parties can justifiably rely on that information. Accordingly, I would reverse the order sustaining Columbia Gas's preliminary objections based upon a negligence cause of action and dismissing ETI's complaint.

¶ 3 The following facts are clear: Columbia Gas had a statutory duty as a "facility owner" under the Act to supply proper and complete information with regard to demarcation of its gas lines; it admittedly breached that duty by improperly marking and failing to mark some of those lines; and ETI, an excavator/contractor under the Act, suffered damages from Columbia Gas's negligence. Despite these facts, the majority concludes that ETI should be barred from recovering economic damages based upon the following reasons: under the economic loss doctrine, purely economic claims are not recoverable in tort actions; a public utility is not a professional information provider; the Restatement (Second) of Torts, Section 552, is inapplicable to the instant case because a facility owner under the Act does not

engage in supplying information to others for pecuniary gain, and does not have any other interest or relationship to the parties involved in the transaction which necessitates a contractor's/excavator's work; the Act, itself, does not provide for a private cause of action for negligence; and the risks and damages suffered by contractors/excavators are not the type the Act seeks to prevent.

¶ 4 The purpose of the economic loss doctrine, which is heavily relied upon by the majority, is to "maintain[ ] the separate spheres of the law of contract [warranty] and tort." *New York State Electric & Gas Corp. v. Westinghouse Electric Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 925 (1989). The doctrine was first espoused in product liability cases in the context of commercial sales. Over the years, exceptions to the doctrine have been created by our courts. *See e.g., New York State & Gas Corp., supra* (plaintiff was precluded from recovering economic damages as result of defective design of defendant's product (turbines on a ship) supplied to plaintiff; however, plaintiff *could* recover damages to its "other property" arising out of defendant's negligent manufacturing of original product); *Waterware Corp. v. Ametek/US Gauge Division,* 51 Pa. D. & C.4th 201, 2001 WL 1112975 (Com.Pl. Phila. County 2001) (plaintiff could not recover economic damages for defendant's defective sensors, but could recover for costs of replacing other component parts of sewer system damaged on account of defective sensors).

¶ 5 Further exceptions to the economic loss doctrine have been adopted in our Commonwealth in an effort to respond to the reality that negligent misrepresentation claims often arise in the context of non-contractual relationships where there is no pecuniary gain—such as the case here. Rather, in many instances, the de-

fendant has a recognized legal duty (such as by statute) to provide information to a plaintiff and the latter suffers purely economic losses as a result of the former negligently supplying that information. Section 552 is a necessary vehicle used to curtail a plaintiff's negligence in failing to adhere to recognized legal duties.

¶ 6 One of the majority's main reasons for disallowing ETI's negligence claim is a primary reason why I believe ETI should be permitted to state a cause of action for economic damages for Columbia Gas's negligence—namely, that Columbia's duty under the Act is protective in nature to both the public and the facility owner's lines. The breach of such a widespread public duty, which has the potential to negatively affect countless people, should be reason alone to permit recovery when that entity has caused substantial economic damages.

¶ 7 The majority also reasons that "[n]owhere in the Act does it state that there is a right to recover economic damages (in the form of cost overruns in its contract with the project's owner) for failure to comply with the duties imposed by the Act," Majority Opinion, at 118, but, rather the Act specifies that its provisions "shall not affect any civil remedies for **personal injury or property damage,** except as otherwise specifically provide for in this act." *Id.* (emphasis in original). The majority would construe this bolded language as the legislature's intent to limit any civil damages to just those enumerated, personal injury or property damage. I disagree.

¶ 8 The Act specifies that one of the factors to be considered when assessing fines against a non-complying facility owner is "the degree of threat to the public safety **and *inconvenience* caused by the party's noncompliance."** 73 P.S. § 182.2(c)(3) (emphasis added). Thus, the drafters of the Act did in fact contemplate the reality that a facility owner's non-compliance would create public inconvenience and that such owners should be sanctioned for creating these losses. Moreover, while not further defined in the Act, I would interpret this bolded phrase to encompass a contractor's/excavator's disruption of work and loss of manpower—precisely those damages alleged in ETI's complaint.

¶ 9 The Act also delineates that the public inconvenience factor is to be considered, for purposes of imposing fines, *in addition to* the amount of personal and property damage caused as a result of noncompliance under the Act. 73 P.S. § 182.2(c)(2). Thus, unlike the majority's narrow reading of the statute, it is apparent that the Act does not treat the factors under subsection (c)(2) & (3) as mutually exclusive—they *both* are to be considered as bases for sanctions when an owner has not complied with the Act.

¶ 10 In sum, under the Act Columbia Gas was required to mark its underground gas lines. Admittedly, Columbia marked several lines improperly and in some cases failed to mark lines at all. As a result of ETI striking the lines several times, it incurred more than $74,000 in economic damages due to downtime of personnel and equipment. Because limiting ETI's right to recover economic damages in this instance would promote careless or indifferent compliance with the Act, contrary to the legislative purpose of imposing a statutory duty for utility companies such as Columbia Gas and the intent behind Restatement § 552(3), I must dissent.