J-A28044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.M., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.M., FATHER, | |
| Appellant | No. 433 EDA 2015 |

Appeal from the Order January 9, 2015
In the Court of Common Pleas of Pike County
Civil Division at No(s): CP-52-DP-0000016-2011

BEFORE:  GANTMAN, P.J., PANELLA, and SHOGAN, JJ.

MEMORANDUM BY SHOGAN, J.:                  **FILED DECEMBER 21, 2015**

R.M. ("Father") appeals from the order entered on January 9, 2015, that granted the petition filed by Pike County Children and Youth Services ("CYS" or the "Agency") to terminate his parental rights to his daughter, R.M. ("Child") who was born in November of 2009, pursuant to 23 Pa.C.S. § 2511(a)(1), (2) and (8), and (b).[1]  We affirm.

The trial court set forth the relevant facts and procedural history of this matter as follows:

> [Father] is the natural father of ["Child"].  [Child] was born [in November of 2009] to Father and [Mother].  [Child] was first

---

[1] In a decree dated January 7, 2015, and entered on January 9, 2015, the trial court granted the petition filed by Child's mother, J.M., ("Mother"), seeking the voluntary relinquishment of her parental rights to Child.  Mother has not appealed the decree nor is she a party to this appeal.

placed with the Agency on June 20, 2011 and adjudicated dependent seven days later. [The Agency] filed its first Petition for Involuntary Termination of Parental Rights (hereinafter "first petition") on March 20, 2013. Mother and Father were both incarcerated in Pike County Correctional Facility at the time.

[The trial court] denied the first petition, issuing its Findings of Fact and Conclusions of Law on the matter on October 3, 2013 (hereinafter "October Findings" or "October Conclusions," as appropriate).

Trial Court Opinion, 3/9/15, at 1-2.

In its October Conclusions, the trial court found, *inter alia*, as follows:

24. Based on Father's efforts thus far to maintain a consistent, loving relationship with [Child], the [trial court] is unable to conclude at this time, by clear and convincing evidence, that he cannot or will not remedy the conditions that have led to [Child's] placement.

25. **Should Father fail to make immediate, substantial progress toward a permanent release from incarceration, maintenance of sobriety from drug use, commencement of appropriate, recommended drug and alcohol counseling, securing of stable housing, continuation of regular, consistent, productive visits with [Child] and obtaining regular employment, then the [c]ourt will be amenable to reconsidering its decision made herein.**

26. With regard to both parents, there is little margin for error in their future efforts at rehabilitation and continued pursuit of reunification with their minor child.

27. Either party's failure to screen negatively for drug use, to seek regular employment, to secure stable housing, to exercise regular consistent visits with the minor child or to complete any other appropriate action could result in termination of his or her parental rights.

Trial Court Order, 1/9/15, at 1-3 (quoting October Conclusions) (emphasis added).

Father was released from prison in January of 2014. Ten months after Father was released from prison, the Agency filed a second petition for the involuntary termination of Father's parental rights on October 30, 2014. On October 31, 2014, the trial court entered an order scheduling a hearing on the termination petition for December 3, 2014, that ultimately was re-scheduled for January 7, 2015. At the January 7, 2015 hearing, the Agency presented the testimony of Lauren Buccine, the Agency caseworker. N.T., 1/7/15, at 4. The Agency also presented the testimony of Cindy Luyando, who supervised the visits between Father and Child. *Id.* at 49.

Ms. Buccine testified that she had been Child's caseworker since Child entered placement at the age of nineteen months, on June 27, 2011. N.T., 1/7/15, at 4-5. At the time of the hearing, Child was five years and two months old and had been in placement for forty-three months. *Id.* at 5. Child resided in a Pike County foster home. *Id.* As noted above, in the trial court's October Conclusions, the trial court directed Father to make substantial progress to gain permanent release from incarceration, to obtain employment and stable housing, and to engage in consistent, productive visitation with Child. *Id.* at 6-7. Father was released from prison in January 2014, at the expiration of his maximum sentence. *Id.* at 7.

After his release, Father attended two visits during January of 2014. N.T., 1/7/15, at 7. Father did not visit Child in February or March of 2014. *Id.* He requested night or weekend visits to accommodate his work

- 3 -

schedule, but he failed to provide proof of his work schedule. *Id.* In March of 2014, Ms. Buccine wrote a letter to Father, addressed to the office of his legal counsel, as Father had no mailing address or residence at the time. N.T., 1/7/15, at 8; Petitioner's Exhibit 1. In the letter, Ms. Buccine stated that Father had been a "no call/no show" for two visits in January of 2014 and two visits in February of 2014, had cancelled two visits in February 2014, and had cancelled his visits for March of 2014. N.T., 1/7/15, at 8-9. In the letter, Ms. Buccine informed Father to contact the Agency to make accommodations to attend visits. *Id.* Beginning in April of 2014, Father scheduled two visits per month, occurring on Mondays. *Id.* at 8.

In September of 2014, Ms. Buccine wrote a second letter to Father summarizing his visits between March of 2014 and August of 2014. N.T., 1/7/15, at 9-10; Petitioner's Exhibit 2. During this period, Father was a "no show/no call" for two of twelve possible visits, he cancelled two visits, attended three visits late, and rescheduled a visit. *Id.* Ms. Buccine received updates from Cindy Luyando, who supervised the visits. *Id.* at 12.

When Father was released from prison in January of 2014, he lacked housing until the middle or end of March. N.T., 1/7/15, at 10-11. He then rented a single room with a bathroom and a kitchen nook in Milford on a weekly basis, but he lacked a lease or other written agreement regarding his occupancy. *Id.* Father began leasing an additional apartment in October of 2014, but he did not inform the Agency until November 17, 2014. *Id.* at 11.

Between the time of the trial court's October 3, 2013 order and October of 2014, Father failed to provide the Agency with proof that he obtained a stable residence. *Id.* at 11-12.

Ms. Buccine observed one visit between Father and Child, which occurred in September of 2014. N.T., 1/7/15, at 12-14. The visit took place in a park, at Child's request. *Id.* Child enjoyed playing on the playground equipment, but she did not want to interact with Father or want Father to direct her activities. *Id.* at 14. At the park visit, Father did not perform any parental duty, aside from playing with Child for about an hour. *Id.* at 15-17. He brought a donut for Child, which she ate. *Id.* at 15-17. Child was not affectionate toward Father, and she refused to hug him at the end of the visit. *Id.* Ms. Buccine opined that Child had no bond with Father. *Id.* at 14-15. Child refers to Father as "jail dad," and she has also stated that Father is dead. *Id.* at 14-15. Child refers to her foster father as "Dad," and she has never lived with Father. *Id.*

Ms. Buccine testified that the termination of Father's parental rights is in Child's best interest. N.T., 1/7/15, at 17. She explained that Child had been in placement for forty-three months of her sixty-two-month life at the time of the hearing. *Id.* at 17-18. Child had been placed in the same foster home since she was nineteen months old. *Id.* at 18. Ms. Buccine stated that Child needed a permanent, stable, loving home with a family. *Id.*

Ms. Buccine concluded that the termination of Father's parental rights would bring permanence and stability into Child's life. N.T., 1/7/15, at 39-40. Child could be a normal five-year-old with a consistent family, and she would not have to be pulled from school and her home to attend supervised visits with Father. *Id.* at 40. Ordinarily, parents progress from supervised visits to unsupervised visits, but Father had not progressed to unsupervised visits. *Id.*

The Agency next presented the testimony of Cindy Luyando, who testified she arranges the visits with Father and gives him a copy of the calendar and a letter to sign, confirming that he reviewed it. N.T., 1/7/15, at 50. Ms. Luyando transports Child to and from the visits. *Id.* Initially, the supervised visits occurred in the Agency conference room. *Id.* At the time of the hearing, visits were conducted in the visitation center.[2] *Id.* The visits between Father and Child were always supervised. *Id.* at 50. Ms. Luyando stated that if a parent is consistent in visitation, the Agency will grant the parent unsupervised visits. *Id.* at 51.

Ms. Luyando testified that she gives the visitation sign-in sheet to Father for his signature at the visits. N.T., 1/7/15, at 51-52. If Father does not show for the visit, Ms. Luyando writes "cancelled" and the reasons for the cancellation, and provides a copy to Father. *Id.* at 52. Ms. Luyando

---

[2] The visitation center is a model house with a living room, kitchen, stove, and refrigerator. N.T., 1/7/15, at 66-67.

supervised all visits except the park visit that Ms. Buccine supervised on September 8, 2014. *Id.*

According to the visitation guidelines that Father signed, when Father does not appear for his visitation, Child remains at the Agency for twenty minutes before Ms. Luyando cancels the visit and returns Child to school. N.T., 1/7/15, at 56. When Ms. Luyando informs Child that Father is not coming to the visit, she observes that there is no effect on Child's demeanor. *Id.* at 57. When Ms. Luyando picks up Child to take her to visit with Father, Child is excited to see Ms. Luyando. *Id.* When Ms. Luyando explains that they are going to visit Father, Child asks, "my jail daddy?", and then says, "okay" with a straight face. *Id.* Ms. Luyando also testified that Child calls Father her "jail dad," and she calls her foster father, "Daddy." *Id.* at 58. When Father first visited with Child after he was released from prison, Child would not hug him or engage with him. *Id.* Father did not necessarily do what Child wished, so Child became frustrated and ran to Ms. Luyando instead of Father. *Id.* The visits last for one hour. *Id.* Ms. Luyando explained that, when Father was released from prison, she offered Father weekly visits with Child. *Id.* at 59. Father declined, stating that he would not be able to take time away from his job. *Id.* at 59. When the Agency decreased the visits to biweekly, Father stated that an early Monday visit would be fine so that he could go to work afterward, if necessary. *Id.* Ms. Luyando asked Father to provide his work schedule to Ms. Buccine, but Ms.

Luyando never received such a schedule. *Id.* Ms. Luyando testified that, of the thirty-six possible visits, seven occurred while Father was in prison. *Id.* at 59-60. He attended sixteen of the remaining twenty-nine visits, and was late for five of them. *Id.* Thus, Father saw Child less than sixteen hours in the entire year of 2014. *Id.* During the visits, Ms. Luyando never observed Father perform any parental duties for Child. *Id.* at 60.

Ms. Luyando explained that in a normal parent-child visit, the child and the parent build a bond. N.T., 1/7/15, at 60. In the case of Father and Child, Father dominates the visit, and Child shuts down. *Id.* at 61.

After the close of the Agency's case, Father's counsel made an oral motion to dismiss the termination petition, suggesting that Father had done everything he could possibly do to attend visits, obtain housing, and obtain employment. N.T., 1/7/15, at 73. Father's counsel argued that there was no basis to showing that the conditions that existed at the time Child was removed from his home continued to exist and that there was no evidence to show a lack of a bond between Father and Child. *Id.* The trial court denied the motion. *Id.*

Father then testified on his own behalf. As noted, the Agency took Child into custody in June of 2011, while Father was in prison. N.T., 1/7/15, at 74. Father was released from prison on January 7, 2014, after serving his maximum sentence, and Father admitted that he would have been eligible for parole at an earlier time, within one month of Child being placed with the

Agency. *Id.* at 74-75. He was denied release on parole because of his behavior while incarcerated. *Id.*

Father testified that he is willing to spend more time with Child. N.T., 1/7/15, at 80. He would like the Agency to provide him with more visits. *Id.* Additionally, while the Agency has requested employment verification, Father claims that he is self-employed. *Id.* Father stated that he is a "broker" and "owns" an LLC. *Id.* However, Father also stated that he receives a Form 1099 from Merchant's Exclusions Group for doing work like cutting grass for different people, who pay him directly. *Id.* Father inexplicably testified that he works twenty-four hours a day, seven days a week, and can work on the phone or on the computer. *Id.* at 82. He claimed to work out of New York City and stated that his office is three and one-half hours away from his home by bus. *Id.* Father explained that he works for commissions only, and he was losing his commissions while at the termination hearing. *Id.*

Father stated that he rents an apartment in Milford, Pennsylvania, on a week-to-week basis without a written lease. N.T., 1/7/15, at 83-85. He testified that he also rents an apartment in Hackettstown, New Jersey, for $950 per month and that he had moved there full-time in November of 2014. *Id.* at 84-85. He claimed his rent was current for both apartments. *Id.*

Father opined that he can properly care for Child, and that he knows how to care for babies, children, and animals. N.T., 1/7/15, at 85. He suggested that Child might benefit from counseling if she is uncomfortable with him, and he is willing to participate in counseling. *Id.* at 86. Father testified that there is a bond between Child and him, regardless of whether she refers to him as her "jail dad." *Id.* He stated that Child addresses him as "Dad" at the visits, and that she knows that he is her father. *Id.* at 87. Father also testified that he had Christmas presents from "Santa" for Child in his car that he had been unable to give her. *Id.* Father stated that while incarcerated, he attended parenting classes and that he had continued attending parenting classes since his release. *Id.* Father referred to Child as the baby. *Id.* at 88. Father testified that he wants Child to know him and to live with him and his girlfriend as a family. *Id.* at 87-88. However, Father admitted failing to call or attend visits. *Id.* at 88. In this regard, Father explained as follows:

> I'm putting – managing [my] priorities to getting the baby – let me have the baby[,] of course it's everything could be okay, because it's right there, but you know just like the child support[,] it's not about not having the money, it's about making it like a bill, so you put it like with the cable and the electric instead of like that's your daughter. **It is not such an importance like that it's life or death, it is a bill due on the second, you pay it on the fifth, it's a bill.**

*Id.* at 88 (emphasis added).

Father said he would like to have the visits extended because he is "losing the whole day [of work, so he] might as well have the whole day

visit." N.T., 1/7/15, at 90. Father testified that if he attended every visit with Child, he could have lost his job and would have no place to live as a consequence, so he takes "the good with the bad." *Id.* at 92. Father stated:

> **I'm trying to make that median where everything works that I make it enough at work and this – what is it all for? All these visits and all these court hearings and all these days of missing time from everybody's job, not from my life, my life is small, but everybody in this room is missing time and it's all for this case, for what? To just say oh, look you didn't make enough visits. I don't understand.**
>
> **I'm able to take the baby right now. It is not a fast process, you just don't get her. It is a very slow process.** As you can see I've been home for twelve months and I haven't even had a day at the park, nothing, nothing has ever been on any terms that I thought of or felt like doing.

*Id.* at 92-93 (emphasis added). Father stated that he believes he is doing everything possible for Child, and that he wants to be there for her. *Id.* at 94.

On January 9, 2015, the trial court entered its order involuntarily terminating Father's parental rights. On February 9, 2015, Father filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises two issues on appeal:

1. [Whether] [CYS] has met their burden of proving, by clear and convincing evidence, the grounds for involuntary termination of [Father's] parental rights set forth in 23 Pa.C.S.A. § 2511(a)(1), (2), and (8)?

2. [Whether] [CYS] has met their burden of proving, by clear and convincing evidence, that the termination of [Father's] parental rights would best serve the needs and welfare of the child?

Father's Brief at 10.[3]

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other

---

[3] While Father stated his issues somewhat differently in his Pa.R.A.P. 1925(b) statement, we conclude that the issues in his brief were fairly suggested in the Pa.R.A.P. 1925(b) statement and are, therefore, preserved for our review. *Gongloff Contracting, L.L.C. v. L. Robert Kimball & Associates, Architects and Engineers, Inc.*, 119 A.3d 1070, 1075 n.4 (Pa. Super. 2015).

hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (*quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court terminated Father's parental rights under section 2511(a)(1),(2), (8), and (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will limit our consideration to section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

- 13 -

* * *

>    (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

In our *en banc* decision in *In re Adoption of C.L.G.*, 956 A.2d 999

(Pa. Super. 2008) (*en banc*), we reiterated the two-part test as follows:

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major

- 14 -

aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*Adoption of C.L.G.*, 956 A.2d at 1004 (citations omitted).

This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child. *Adoption of C.L.G.*, 956 A.2d at 1008.[4]

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows:

> [Section] 2511(a)(2) provides [the] statutory ground[] for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> [The Supreme Court] has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

_____

[4] We note that the trial court intertwined its discussion of the considerations under subsection (a)(8) and (b). We focus our discussion on subsection (a)(2), which does not have a "needs and welfare" element.

> *In re Adoption of J.J.*, 515 A.2d 883, 891 (Pa. 1986),
> *quoting In re: William L.*, 383 A.2d 1228, 1239 (Pa.
> 1978).

*Adoption of S.P.*, 47 A.3d at 827.

In the January 9, 2015 order, in relation to 23 Pa.C.S. § 2511(a)(2), the trial court found it significant that the Agency filed a second petition seeking to terminate Father's parental rights to Child after his release from incarceration. Trial Court Order, 1/9/15, at 2. The trial court found as follows:

> The evidence presented at the [h]earing clearly indicates that [Father] was granted visitation with [C]hild. He had seven visits prior to his release from jail[,] and each of those visits occurred because Pike County Children and Youth Services arranged for and transported [C]hild to the jail. Following his release from jail, however, [Father] was scheduled for 29 visits with [C]hild[,] but [Father] missed 13 of those visits and was late for 5 other visits. Of the visits missed, each one was a "no show, no call" failure to appear.

> Father had no real basis for his failure to appear at these visits. Further, at the visits that did occur, the relationship of [Father] and [C]hild remained somewhat strained. In addition, Father has made no effort to seek to improve his visits or his relationship with [C]hild. He has not sought additional or extended visits and does not appear to have made any effort to perform parental duties to [C]hild during that entire period of time.

> Father has obtained employment and a stable living arrangement over the last year but has not made serious attempts to expand his parental roles with his daughter. [C]hild is now slightly over 5 years of age and has been in the care of Pike County Children and Youth Services since June 20, 2011. Father was originally sentenced [in December of 2008] . . . As a result of multiple parole and probation violations, Father was found in violation of the terms and conditions of his probation and parole[,] and was again sentenced on those violations [in

- 16 -

January of 2010]. Even though this was a State sentence, it was to be served in the Pike County Jail. Despite being eligible for parole from that State sentence beginning in July of 2011, Father failed to qualify for State [p]arole on multiple occasions[,] and served his maximum sentence[,] and was ultimately released in January [of] 2014. During this period, Father had little opportunity to establish a positive parental relationship with [C]hild. Following his release on parole, he was given the opportunity to establish a positive parental relationship with [C]hild, but he has not actively and diligently pursued that goal. Father has had little involvement in his daughter's life for the last four (4) years and has not properly utilized his scheduled visitation as a stepping stone to re-establishing a relationship with her.

Trial Court Order, 1/9/15, at 3-4.

This Court has stated that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.,* 797 A.2d 326, 337 (Pa. Super. 2002). We may properly reject a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, as untimely or disingenuous. *Id.* at 340.

In its opinion, the trial court assessed the evidence regarding Father's repeated incapacity to parent Child and Father's inability to remedy the conditions and causes of his incapacity to parent Child as follows:

We said of Father in our denial of the Agency's first petition that "[b]ased on [his] efforts thus far to maintain a consistent, loving relationship with [Child], the [trial court] is unable to conclude[,] at this time, by clear and convincing evidence, that he cannot or will not remedy the conditions that have led to [Child's] placement." October Conclusions at ¶ 24.

We went on to say specifically of Father that should he:

fail to make immediate, **substantial progress toward a permanent release from incarceration,** maintenance of sobriety from drug use, commencement of appropriate, recommended drug and alcohol counseling, **securing of stable housing, continuation of regular, consistent, productive visits with [Child,] and obtaining regular employment,** then the [trial court] will be amenable to reconsidering its [denial of the Agency's first petition] made herein.

October Conclusions at ¶ 25 (emphasis added).

\* \* \*

The lack of a bond between Father and [Child], which we discuss in greater detail, *infra*, indicates that Father "has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S.A. § 2511(a)(2). There are few more essential parenting duties than forming a healthy and strong bond with one's child. Father's behavior has not at any point suggested he can or will remedy "the conditions and causes of the incapacity, abuse, neglect or refusal." *Id.* [Child's] confusion was testified to by Agency case worker Lauren Buccin[e], who noted that [C]hild calls Father her "jail dad" and calls her foster father "daddy." We found those circumstances together supported a finding that 23 Pa.C.S.A. § 2511(a)(2) had been fulfilled.

Trial Court Opinion, 3/9/15, at 5-7.

We conclude that the trial court's credibility and weight determinations and conclusions of law are supported by competent evidence in the record. As such, we discern no abuse of the trial court's discretion in terminating Father's parental rights pursuant to section 2511(a)(2). *See **In re Adoption of S.P.**,* 47 A.3d at 826-827.

- 18 -

Next, we address section 2511(b). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

We have stated that, in conducting a bond analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. **In re K.Z.S.**, 946 A.2d 753, 764 (Pa. Super. 2008). We have also stated that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. **See In re Z.P.**, 994 A.2d at 1121.

The trial court found as follows with regard to section 2511(b):

- 19 -

This section of the statute "requires the trial court to determine what effect breaking an existing parent-child bond will have on the child currently, not speculating whether a bond may be formed in the future." *In re Adoption of J.M.*[ ], [991 A.2d 321, 325 (Pa. Super. 2010)]. There is no bond between Father and [Child], as is clear from the record. [Child] showed no excitement or interest when told by Agency staff that it was time to visit with Father. She reacted with flat affect when told that Father had not appeared in time for the visit and they could wait no longer for him. He remained "jail dad" to her, and her foster father remained "daddy."

And that is only the evidence presented that there is no expression of a bond from her side. There was also significant evidence that Father feels no bond from his side, either. Unexplained failure to attend visits suggests a lack of consideration or interest. Father referred [to Child] as a "baby" several times throughout these proceedings, including at the January 7, 2015 hearing, despite the fact that she is now five years old. He testified that he is good with "kids and animals." Father was eligible for parole many times prior to his January 2014 release but chose, of his own free will, not to pursue it, saying at the January 7, 2015 hearing that he was working on getting his "stuff" together instead of choosing to leave prison as soon as possible. He later testified that he was amenable to visits longer than one hour because[,] whenever he had a scheduled visit with [Child], he was "losing the whole day" anyway. Moreover, Father does not know her favorite color, toy, food or television show and cannot name her doctor or her dentist. These are small infractions of which even the best of parents may sometimes be found guilty, but[,] taken in the aggregate with the above and with all set forth below[,] they underscore Father's general lack of interest in [Child].

Finally, and perhaps most indicative of Father's lack of any sense of or interest in a bond with [Child], at the January 7, 2015 hearing[,] he referred to [Child] several times as "just a bill" because she was not living with him. This was his explanation for missing his support payments in November and December, 2014. The parties were notified by an order dated October 31, 2014[,] that the original termination hearing would be held on December 3, 2014. The hearing was continued on that day until January 7, 2015[,] when it actually occurred.

In other words[,] Father was aware he was going to court to defend his parental rights two months in a row, and failed to make support payments in both of those months. The Agency petitioned for a hearing[,] at which it would argue Father should be placed on probation for failing to make his support payments, but he brought his support account current on December 29, 2014. His January 2015 support payment was five days late as of the January 7, 2015 hearing as well. This is not the conduct of someone who feels a bond to their child, or for whom retention of their parental rights is a priority. We decided to terminate Father's parental rights despite his protestations of progress because[,] as the Superior Court said about a defendant mother in similar proceedings in 2008:

> [I]f we were to permit [m]other further opportunity to cultivate an environment where she can care for [her child], we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best.

**In re Adoption of C.L.G.**, [956 A.2d at 1008].

[Child] is five years old. She has been in placement since she was 19 months of age. If [Child] was on the brink of "a state of proverbial limbo" after a little more than 24 months in placement, then surely "limbo" is too delicate a word for what [Child] has dealt with for the past *41 months*.

Trial Court Opinion, 3/9/15, at 8-10 (emphasis in original).

We find the trial court's conclusions with regard to section 2511(b) are supported by competent evidence in the record. As such, there was no abuse of the trial court's discretion in terminating Father's parental rights under section 2511(b). **Adoption of S.P.**, 47 A.3d at 826-827. Accordingly, we affirm the trial court's order terminating Father's parental rights to Child.

Order affirmed.

- 21 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/21/2015</u>