2015 PA Super 149

GONGLOFF CONTRACTING, L.L.C.,      IN THE SUPERIOR COURT OF
PENNSYLVANIA

Appellant

v.

L. ROBERT KIMBALL & ASSOCIATES,
ARCHITECTS AND ENGINEERS, INC.,

Appellee      No. 785 WDA 2014

Appeal from the Order Dated May 5, 2014
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): GD-12-013865

BEFORE: PANELLA, SHOGAN, and OTT, JJ.

OPINION BY SHOGAN, J.:      **FILED JULY 08, 2015**

Appellant, Gongloff Contracting, L.L.C., ("Gongloff") appeals from orders entered on April 18, 2013, and May 5, 2014, in the Court of Common Pleas of Allegheny County. The order entered on April 18, 2013, granted the motion for judgment on the pleadings of Appellee, L. Robert Kimball & Associates, Architects and Engineers, Inc.'s ("Kimball"). That order was made final on May 5, 2014, by an order on a stipulation to dismiss fewer than all defendants pursuant to Pa.R.C.P. 229(b)(1). After careful consideration, we reverse and remand for further proceedings.

Because this Court sits in review of the trial court's grant of Kimball's motion for judgment on the pleadings, all well-pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, are considered as

true. **Citicorp North America, Inc. v. Thornton**, 707 A.2d 536, 538 (Pa. Super. 1998). The facts, then, are gleaned from Gongloff's amended complaint and, to a limited extent, its response to allegations raised in Kimball's new matter. **See Altoona Regional Health System v. Schutt**, 100 A.3d 260, 265 (Pa. Super. 2014); **Swift v. Milner**, 538 A.2d 28, 31 (Pa. Super. 1988) (in determining propriety of trial court's award of judgment on the pleadings, we accept as true all well-pleaded statements of fact of non-moving party and "against that party only those facts specifically admitted.").

In 2009, California University of Pennsylvania (the "University") engaged Kimball as the architect-engineer for the construction of a convocation center. After Kimball completed the design, the University hired Whiting-Turner Contracting Company ("Whiting-Turner") as the general contractor. Whiting-Turner then entered into a contract with Kinsley Construction, Inc. ("Kinsley") to do the structural steel fabrication and erection. On January 18, 2010, Kinsley entered into a subcontract agreement with Gongloff, under which Gongloff agreed to provide all labor, materials, and equipment to erect the structural steel for $990,230.00. Am. Compl. at ¶¶ 9–12. Kinsley also entered into a subcontract with Vulcraft Inc. ("Vulcraft") to detail and fabricate the long-span steel trusses, which would then be delivered to the site and erected by Gongloff. In addition, Kinsley hired Josh Carney of Carney Engineering ("Carney"), a

- 2 -

registered professional engineer, to assist in the detailed design of the structural steel. *Id.* at ¶¶ 15–16. Kimball's design of the steel structure was supplied to all of the aforementioned parties. *Id.* at ¶ 49.

In January and February of 2010, both Vulcraft and Carney raised concerns about Kimball's roof design for the convocation center. During preconstruction meetings, they repeatedly opined that the entire design of the roof system was faulty. "In particular, they warned that the header beams that supported the roof trusses were drastically undersized." Am. Compl. ¶ at 17. Despite these concerns, on March 17, 2010, Gongloff began to erect the steel structure that Kimball had designed. While Gongloff had to address some design problems, work proceeded relatively smoothly for about eight weeks. *Id*. at ¶ 20. However, at about mid-point in this eight-week period, Vulcraft issued a letter maintaining that the Kimball-designed roof system "was not adequate to bear the construction loads." *Id*. at ¶ 21. Kimball denied that the roof design was faulty. *Id*. at ¶ 22.

Shortly after Kimball's assurances about the soundness of the design, Kimball rejected Gongloff's proposed erection procedure, even though it had been approved by Carney, the structural engineer. At this point, Kimball acknowledged that the as-designed trusses could not accommodate the construction loads. Am. Compl. at ¶ 23. On May 3, 2010, Carney confirmed that Kimball's roof was "grossly inadequate." *Id*. at ¶ 25.

Gongloff continued to experience a myriad of problems, including three shut-downs of the steel erection project, traceable to Kimball's "never-before-utilized" defective design. Am. Compl. at ¶¶ 24–26, 30, 34. Attempts to redesign the structure and address its structural inadequacies substantially increased Gongloff's costs. *Id*. at ¶¶ 27, 32, and 39. To address the required adjustments, Gongloff submitted eighty-one change order requests for the amount of additional work that was beyond the scope of its original bid. *Id*. at ¶¶ 39–40. While some of the change orders were initially approved and paid for by Kinsley, eventually Kinsley ceased making payments. *Id*. at ¶¶ 41–42. In mid-February, 2011, Gongloff laid off its crew and left the job-site. *Id*. at ¶ 42. Gongloff has been unable to fully pay its vendors and suppliers on the project, and its overall reputation has been significantly harmed. *Id*. at ¶¶ 43–44. Although the convocation center is now complete and standing, Gongloff denies that the structural system is the same as originally designed by Kimball. Gongloff's Ans. to Kimball's New Matter at ¶ 68.

On August 6, 2012, Gongloff initiated this action against Kimball and two of its engineers for negligent misrepresentation. Because Gongloff sued the wrong Kimball entity, it filed an amended complaint on December 31, 2012, naming the correct party and dismissing the original individual engineers. In response, Kimball filed an answer, new matter, and an amended joinder complaint to join Whiting-Turner, Kinsley, and Carney.

Whiting-Turner and Kinsley filed preliminary objections to Kimball's amended joinder complaint.

After the pleadings closed, Kimball filed a motion for judgment on the pleadings asserting that Gongloff's claims were barred by both the statute of limitations[1] and application of the "economic loss doctrine."[2]  Regarding the latter argument, Gongloff disputed that the economic loss doctrine was applicable, contending instead that its claim against Kimball was governed by an explicit exception to the doctrine, *i.e.*, an action for negligent misrepresentation set forth in Section 552 of the Restatement (Second) of Torts and adopted by the Pennsylvania Supreme Court in ***Bilt-Rite Contractors, Inc. v. The Architectural Studio***, 866 A.2d 270 (Pa. 2005). Gongloff contended that the factual allegations of the amended complaint asserted that Kimball:  1) either explicitly or implicitly represented that the

_____

[1]  The trial court concluded that the amended complaint was not time-barred.  Trial Court Opinion, 4/18/13, at 2.  Kimball did not appeal this aspect of the trial court's decision.

[2]  "Our Supreme Court has defined the economic loss doctrine as providing 'no cause of action [ ] for negligence that results solely in economic damages unaccompanied by physical injury or property damage.'" ***Knight v. Springfield Hyundai***, 81 A.3d 940, 951–952 (Pa. Super. 2013) (quoting ***Excavation Technologies, Inc. v. Columbia Gas Co. of Pennsylvania***, 985 A.2d 840, 841 (Pa. 2009)).

structure could safely sustain all required construction loads and *in situ*[3] loads; 2) either explicitly or implicitly represented that normal construction methods could be employed to erect the structure; and 3) supplied false information, in the form of its structural design of the project. According to Gongloff, these assertions were sufficient to survive Kimball's motion for judgment on the pleadings.

On April 18, 2013, the trial court decided that Gongloff could not pursue its negligent misrepresentation claim and granted Kimball's motion for judgment on the pleadings. The trial court explained its ruling, as follows:

> [Kimball's] second argument deals with the economic loss doctrine as it applies to the facts of the case. The economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. To recover in negligence there must be a showing of harm above and beyond disappointed expectations evolving solely from a prior agreement. Bilt-Rite v. The Architectural Studio, 866 A.2d 270, 283 (Pa. 2005). The Bilt-Rite [] decision adopted Section 552 of the Restatement ([S]econd) of Torts entitled Information Supplied for the Guidance of Others. The Supreme Court went on to recognize that a design professional's liability for economic damages to third parties cannot be without limits. Id. 286.
>
> The language of Section 552 requires that the design professional make a negligent representation that is relied upon

---

[3]  Earlier in the litigation, the parties offered different definitions of "*in situ*" loads, but now apparently agree that the term refers to loads to which a structure is subjected to when it is completed, *e.g.*, accumulated snow on a roof.

by the third party and causes the third party economic harm. [Gongloff] alleges that Kimball either "expressly or impliedly" represented that the structure could safely sustain all required construction loads and in situ loads. No representation to that effect is shown. [Gongloff] may have suffered economic loss but cannot point to the negligent misrepresentation by Kimball that led to the loss. The fact that the design was complex and required further engineering and design by the contractor cannot be attributed to any representation by Kimball.

Finally, [Gongloff] contends that Kimball explicitly or impliedly represented that normal construction methods could be employed to erect the structural steel. There is no express representation concerning means and methods of construction. In fact, Kimball required that the structural steel erector have special credentials issued by the American Institute of Steel Construction.

[Gongloff] did not have said credentials, although sub-contractor Kinsley did. The requirement of special qualifications for the steel erectors undermines [Gongloff's] position that Kimball implied that normal construction methods could be used to erect the structural steel.

Trial Court Opinion, 4/18/13, at 2–3. The trial court did not address the preliminary objections of the additional defendants.

On April 22, 2013, Gongloff appealed the April 18, 2013 order. On March 6, 2014, a panel of this Court quashed the appeal, holding that the trial court's order granting Kimball's motion for judgment on the pleadings was not a final appealable order because the preliminary objections of the additional defendants remained unresolved. **Gongloff v. Kimball, et al**., 680 WDA 2013, 100 A.3d 297 (Pa. Super. March 6, 2014) (unpublished memorandum at 8).

On March 17, 2014, Gongloff filed a motion for final order to dispose of all claims of all parties in the trial court. Thereafter, the parties entered into

a stipulation to dismiss as to fewer than all defendants/additional defendants pursuant to Pa.R.C.P. 229(b)(1). An order approving the stipulation was signed on May 5, 2014. As the April 18, 2013 order granting Kimball's judgment on the pleadings motion was now final, Gongloff appealed to this Court. Gongloff filed its Pa.R.A.P. 1925(b) statement of errors complained of on appeal on May 22, 2014. On December 2, 2014, the trial court issued an order adopting the reasons set forth in its April 18, 2013 Memorandum in Lieu of Opinion pursuant to Pa.R.A.P. 1925(a).

Gongloff raises two issues on appeal:

1. Does Section 552 of the Restatement (Second) of Torts require that a design professional make an *explicit* negligent misrepresentation of a specific fact for a third party to recover economic damages?

2. Did Gongloff properly allege that Kimball either "expressly" or "impliedly" represented that the structure could safely sustain all required *in situ* loads?

Gongloff's Brief at 6 (emphasis in original).[4]

_____

[4] In its Pa.R.A.P. 1925(b) statement, Gongloff also referenced Kimball's alleged misrepresentation that the as-designed structure could safely sustain all required construction loads. Gongloff's Pa.R.A.P. 1925(b) statement, at ¶ 4. Before this Court, Gongloff's "Statement of Questions Involved" limited this issue to Kimball's representation about the structure's ability to handle *in situ* loads. Gongloff's Brief at 6. In the argument portion of its brief, however, Gongloff reverts to its original challenge to the trial court's holding regarding both construction and *in situ* loads. Because Gongloff's Statement of Questions Presented as to this issue fairly suggests that it is contesting the trial court's conclusion concerning both construction and *in situ* loads, we will not find the construction load component of the argument to be waived.
*(Footnote Continued Next Page)*

Our standard of review of judgment on the pleadings is well-settled. A motion for judgment on the pleadings is similar to that of a demurrer in that it may be entered only when there are no disputed issues of fact, and the moving party is entitled to judgment as a matter of law. *Rourke v. Pennsylvania National Mutual Casualty Insurance Co.*, ___ A.3d ___, 2015 WL 1912914, at *2 (Pa. Super., filed April 28, 2015). Appellate review of an order granting a motion for judgment on the pleadings is plenary, and we apply the same standard employed by the trial court. *Id*. We will affirm the grant of the motion "only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise." *Id.* at *3 (citing *Southwest Energy Production Co. v. Forest Resources, LLC*, 83 A.3d 177, 185 (Pa. Super. 2013) (citation omitted)).

Gongloff first argues that the trial court committed legal error when it construed Section 552 of the Restatement to require a design professional to make an explicit negligent misrepresentation before a party can recover economic damages. It offers instead that liability is premised upon the

*(Footnote Continued)* ───────────────────

**See** Pa.R.A.P. 2116(a) ("the statement [of question involved] will be deemed to include every subsidiary question involved or fairly suggested thereby."); **See also Phillips v. Selig**, 959 A.2d 420, 428 (Pa. Super. 2008) (overlooking appellant's incomplete statement of question presented when appellant developed the issue in argument section of his brief, and omission did not impede ability to address merits of issue).

posture and relationship of the parties to the construction project. Our standard of review of this legal question is *de novo* and our scope of review is plenary. ***Egan v. USI Mid-Atlantic, Inc.*** 92 A.3d 1, 10 (Pa. Super. 2014) (citations omitted).

We begin with an overview of the tort of negligent misrepresentation. The elements of a common law claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." ***Bilt-Rite***, 866 A.2d at 277 (quoting ***Bortz v. Noon***, 729 A.2d 555, 561 (Pa. 1999)). Negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." ***Bortz***, 729 A.2d at 561.

Pennsylvania law generally bars claims brought in negligence that result solely in economic loss. ***David Pflumm Paving & Excavating, Inc. v. Foundation Services Company***, 816 A.2d 1164, 1168 (Pa. Super. 2003) ("This Court has consistently denied negligence claims that cause only economic loss"). However, a narrow exception is found in Section 552 of the

Restatement (Second) of Torts entitled, "Information Negligently Supplied

for the Guidance of Others," and provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1).

In **Bilt-Rite**, the Pennsylvania Supreme Court adopted Section 552

and held that it applied in:

> cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.

866 A.2d at 287. The adoption of Section 552 was not meant to "supplant[]

the common law tort of negligent misrepresentation, but rather, [to] clarify[]

the contours of the tort as it applies to those in the business of providing

information to others." *Id.*

Subsequently, in **Excavation Technologies, Inc. v. Columbia Gas

Company of Pennsylvania**, 936 A.2d 111 (Pa. Super. 2007) (*en banc*),

*aff'd*, 985 A.2d 840 (Pa. 2009), this Court explained the Supreme Court's

justification for sanctioning potential Section 552 liability in disputes against

architects and other design professionals:

- 11 -

[O]ur Supreme Court found persuasive the rationale expressed by the Court of Appeals of North Carolina in *Davidson and Jones, Inc. v. County of New Hanover,* 41 N.C.App. 661, 255 S.E.2d 580 (1979), *cert. denied,* 298 N.C. 295, 259 S.E.2d 911 (1979), wherein the *Davidson* court stated:

> An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects . . . . Where breach of such contract results in foreseeable injury, economic or otherwise, to persons so situated by their economic relations, and community of interests as to impose a duty of due care, we know of no reason why an architect cannot be held liable for such injury. Liability arises from the negligent breach of a common law duty of care **flowing from the parties' working relationship.** Accordingly, we hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably **resulting from breach of an architect's common law duty of due care in the performance of his contract with the owner.**

*Bilt-Rite,* at 480-481, 866 A.2d at 286 (quoting *Davidson,* 255 S.E.2d at 584) (emphasis added). A design professional is typically responsible for the preparation of plans and specifications (information) that are supplied to and used by potential bidders in formulating a bid for a project. Additionally, a design professional may make representations to the contractor while performing administrative responsibilities, which are either assumed or specifically made a part of his or her contract with the owner. The design professional is paid a fee for using his or her skills and training to provide information that is relied on by others prior to and during construction. If the plans and specifications prove to be erroneous, the contractor is at grave risk of suffering economic loss. Under these circumstances, it is quite clear that the design professional is supplying information in his or her professional capacity, as part of his or her business, for the guidance of others in a business transaction. Furthermore, a design professional's negligent misrepresentation could injure a third party in a variety of ways. Accordingly, the Supreme Court had little trouble reaching the

conclusion that the requirements of section 552(1) are met under these circumstances. This was a logical conclusion because there are numerous tasks performed by the design professional on a typical project that support the conclusion that he or she is in the business of supplying information.

*Id*. at 115. This Court then detailed the elements required to establish liability under Section 552(1) of the Restatement:

the defendant is in the business of supplying information for the guidance of others and the information provider must have a pecuniary interest in the transaction; the information provided is false; the information was justifiably relied upon; and the defendant failed to exercise reasonable care in obtaining or communicating the information.

*Id*. at 115–116. The Court, however, noted that the scope of liability under Section 522(1) was limited to those known by the information provider who are intending to engage in a commercial transaction and whom the provider means to influence in that transaction with its information. *Id*. at 116.

We are persuaded that **Excavation Technologies**, interpreting the reach of **Bilt-Rite**, could reasonably be understood to subject architects to liability for Section 522 negligent misrepresentation claims when it is alleged that those professionals negligently included faulty information in their design documents. The design itself can be construed as a representation by the architect that the plans and specifications, if followed, will result in a successful project. If, however, construction in accordance with the design is either impossible or increases the contractor's costs beyond those anticipated because of defects or false information included in the design, the specter of liability is raised against the design professional.

Kimball, to the contrary, avers that courts applying Section 522 subsequent to **Bilt-Rite** have held that an "actual misrepresentation" is required, *citing* **State College Area School District v. Royal Bank of Canada**, 825 F. Supp. 2d 573, 584 (M.D. Pa. 2011), and that **Bilt-Rite** itself refers to an "express representation" made by the architect. 866 A.2d at 272. Kimball asserts that the language in these cases requires Gongloff to identify some particular communication or document provided by Kimball that was false.

We do not agree that **State College** and **Bilt-Rite** compel such a conclusion. In **State College**, a federal court, applying Pennsylvania law, declared that "[a] negligent misrepresentation claim requires an actual misrepresentation as opposed to assumptions on the part of the recipient." 825 F.Supp.2d at 584 (citation omitted). The word "actual," however, differs in meaning from the word "express," which was employed by the trial court to describe Gongloff's pleading requirements in this matter.[5] Merriam–Webster defines "actual" as "existing in fact." MERRIAM–WEBSTER, http://www.Merriam-Webster.com/dictionary/actual (last visited June 17, 2015). Indeed, the court in **State College** embraced this definition of

_____

[5] We note that the trial court used the word "express" in rejecting Gongloff's assertion that Kimball represented that normal construction methods could be utilized to erect the structural steel. Although Gongloff did not appeal this specific trial court finding, we view the challenged language as indicative of the trial court's misunderstanding of the proper standard for evaluating motions for judgment on the pleadings.

- 14 -

"actual" when it described its opposite meaning as "assum[ed]." 825 F.Supp. 2d at 584. The actual misrepresentation alleged by Gongloff here was Kimball's roof design, composed of tangible documents which exist in fact.

"Express," on the other hand, is defined as "directly, firmly, and explicitly stated." MERRIAM–WEBSTER, http://www.Merriam-Webster.com/dictionary/ express (last visited June 17, 2015). The word "express" contemplates a higher degree of exactitude than the word "actual." Accordingly, requiring Gongloff to explicitly pinpoint the specifics of the faulty design, *i.e.*, to refer to an express representation by Kimball, is not endorsed by the language in **State College**, and, more significantly, is inappropriate at the judgment on the pleadings stage.[6]

Nor does **Bilt-Rite** necessitate Gongloff's precise identification of a misrepresentation in the design documents. While Kimball is correct that in its factual recital of the case, the Supreme Court detailed that the design professional therein "expressly represented" that its aluminum curtain wall "could be installed and constructed through the use of normal and

---

[6] Regardless, "pronouncements of the lower federal courts have only persuasive, not binding, effect on the courts of this Commonwealth— although we certainly are bound by the decisions of the U.S. Supreme Court on questions of federal law." **In re Stevenson**, 40 A.3d 1212, 1221 (Pa. 2012) (citation omitted).

reasonable means and methods, using standard construction design tables," *see Bilt Rite*, 866 A.2d at 272, the Court did not include an "express representation" as an element of a Section 552 negligent misrepresentation claim. Instead, *Bilt-Rite* explained that recovery under Section 552 is permissible in cases where one in the business of supplying information, such as an architect, negligently supplies such information when he knows that third parties will likely use or rely on the information. *Herndon Borough Jackson Township Joint Municipality Authority v. Pentair Pump Group, Inc.*, No. 4: 12-cv-01116, 2015 WL 2166097, at *7 (M.D.Pa. May 5, 2015) (quoting *Bilt-Rite*, 866 A.2d at 287). *Bilt-Rite* requires only that information, a rather general term, be negligently supplied by the design professional. Accordingly, the trial court's decision that Gongloff was required to identify an express representation by Kimball to succeed on its Section 522 claim was legally erroneous.

Our contrary legal conclusion, however, does not, in and of itself, mandate reversal of the trial court's decision. Gongloff cannot defeat entry of judgment on the pleadings against it merely by contending in its amended complaint that Kimball supplied design documents to the participants involved in the convocation center construction. It also was required to plead with some specificity that the documents included false information. The parameters of Gongloff's pleading obligation form the basis of Gongloff's second argument—that the trial court prematurely held that

Gongloff failed to prove what it averred. Gongloff asserts that the court erred when it faulted Gongloff for failing to show that Kimball "explicitly or impliedly represented that the structure could safely sustain all required construction and *in situ* loads." Trial Court Opinion, 4/18/13, at 3.[7] Gongloff takes particular umbrage with the trial court's language that "[no] representation to that effect was shown," **id**., because it contradicts what is required when considering a motion for judgment on the pleadings. Gongloff avers that use of the word "shown" indicates that instead of accepting Gongloff's assertion that Kimball either expressly or impliedly represented that the structure could safely sustain the construction and *in situ* loads as

_____

[7] In its appellate brief, Gongloff, for the first time, maintains that it identified an express representation by Kimball as to the ability of the structure to safely sustain all required construction loads. Gongloff claims that the allegation included in paragraph fifty of its amended complaint that Kimball either explicitly or impliedly represented that its structural design was adequate was premised upon Rider E to the Agreement between the University and Kimball. The Rider provided that the University's approval of "plans and specifications shall not diminish [Kimball's] obligation to provide plans and specifications that are adequate to accomplish the purposes of the project." Kimball's Ans. and New Matter, Ex. A. Gongloff, however, did not identify Rider E as an express representation by Kimball in its amended complaint or in the related proceedings before the trial court. Thus, we will not consider the significance of its language on appeal. **See Majorsky v. Douglas**, 58 A.3d 1250, 1258 (Pa. Super. 2012) (rules of appellate procedure mandate that "issues not raised in the lower court are waived and cannot be raised for the first time on appeal) (quoting Pa.R.A.P. 302(a)).

true, the trial court determined that Gongloff failed to prove the assertion—an obligation in conflict with Gongloff's burden at this stage of the litigation.

We agree with Gongloff that the trial court's finding that Gongloff failed to *show* an express or implied representation implicates matters related to proof, as opposed to matters accepted as true. We thus review the allegations of the amended complaint to determine whether Gongloff has *alleged* sufficient facts to meet the **Bilt–Rite** exception to the economic loss doctrine.

First, Gongloff alleged that Kimball supplied its design to the parties working on the convocation project "in order to provide guidance . . . as to how the Convocation Center was to be built." Am. Comp. at ¶ 49. Taken as true, this language sufficiently alleges that Kimball understood it was "foreseeable that the information [would] be used and relied upon by third persons[.]" **Bilt–Rite**, 866 A.2d at 287. Second, Kimball clearly qualifies as a design profession "in the business of supplying information[.]" **Id.**; Am. Compl. at ¶ 5. Third, Gongloff alleged the following instances where the feasibility of construction of the convocation center's roof in accordance with Kimball's design was called into question or determined to be impossible, thereby permitting an inference that the design included false information:

- during pre-construction meetings, Vulcraft and Carney stated that the design of the never-before-utilized roof system was faulty, particularly

that "the header beams that supported the roof trusses were drastically undersized." ***Id***. at ¶ 17.

• Brian Gongloff, Gongloff's General Manager, articulated concerns "about the adequacy of the roof truss system in the context of the safety of Gongloff's employees working on the roof during its erection." ***Id***. at ¶ 18.

• On April 14, 2010, Vulcraft disseminated a letter "stating that the entire long-span truss roof system, as designed by Kimball, was not adequate to bear the construction loads to which it would be subjected." ***Id***. at ¶ 21.

• Kimball acknowledged that "under construction loads, the as-designed trusses were placing an excessive lateral load on the as-designed header beams that supported them, thereby subjecting the header beams to biaxial bending and overstressing them, as well as causing the header-to-column connections to fail." ***Id***. at ¶ 23.

• Gongloff was forced to develop "six site-specific truss-erection plans to try to keep up with Kimball's ongoing but incompetent efforts to revise the design." ***Id***. at ¶ 24.

• "On May 3, 2010, Carney[] issued a letter confirming that Kimball's roof design was grossly inadequate." ***Id***. at ¶ 25.

- On May 24, 2010, Kimball revised the connection details of the trusses to the supporting columns. "This revision was intended to remedy the deficiencies in [Kimball's] original design." *Id*. at ¶ 28.

- On or about July 15, 2010, Vulcraft warned that the inadequacy of the roof system prohibited implementation of standard steel decking procedures. Gongloff was required to undertake an alternate cumbersome procedure that substantially increased its costs. *Id*. at ¶ 31.

- Similarly, the inadequacy of the roof system necessitated an expensive procedure for erection of the catwalk "that was not contemplated in the bid documents." *Id*. at ¶ 32.

- The catwalk itself was improperly designed by Kimball. "This error caused further delay, and additional work, as the trusses had to be reinforced in order to carry the catwalk." *Id*. at ¶ 36.

Additionally, in detailing the basis of its negligent representation claim, Gongloff alleged:

> 50. In providing the structural design of the Convocation Center to these parties, [Kimball] either explicitly or implicitly represented to those parties, including Gongloff, that the structural design was adequate and that the structure could safely sustain all required construction loads and in situ loads and that normal construction methods could be employed to erect the structure.
>
> 51. [Kimball's] foregoing representation as to the adequacy of its structural design was materially false information, inasmuch as the structural design, including, specifically the design of the long-span-joists and their support system, was not adequate to

safely sustain all required loads and normal construction methods could not, in fact, be utilized to erect the structure.

Am. Compl. at ¶¶ 50, 51.

We conclude that the amended complaint's allegations that Kimball's design documents constituted negligently-supplied false information have been pled with the appropriate level of specificity to state a cause of action for negligent misrepresentation under Section 552 of the Restatement (Second) of Torts. While Kimball might prove later in the litigation that the allegation that it provided false information concerning the integrity of its roof design was unsubstantiated, it is not entitled to judgment in its favor at this stage of the proceedings. Accordingly, the trial court's order granting judgment on the pleadings in favor of Kimball was premature and is reversed.

Order reversed and remanded for consistent proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/8/2015