J-A28026-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| WILLIAMS PONTIAC COMPANY AND BRUCE L. SANFT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| PATRIOT BUICK PONTIAC GMC, INC. | : | No. 1459 EDA 2017 |
| | : | |
| BRUCE L. SANFT | : | |
| | : | |
| v. | : | |
| | : | |
| PATRIOT BUICK PONTIAC GMC, INC. | : | |

Appeal from the Judgment Entered April 3, 2017
In the Court of Common Pleas of Montgomery County
Civil Division at No(s):  No. 06-17613,
No. 06-18948

| | | |
|---|---|---|
| WILLIAMS PONTIAC COMPANY AND BRUCE L. SANFT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PATRIOT BUICK PONTIAC GMC, INC. | : | |
| | : | |
| Appellant | : | No. 1964 EDA 2017 |
| | : | |
| BRUCE L. SANFT | : | |
| | : | |
| v. | : | |
| | : | |

PATRIOT BUICK PONTIAC GMC, INC.   :
   :
   :
   :


Appeal from the Judgment Entered April 3, 2017
In the Court of Common Pleas of Montgomery County
Civil Division at No(s):  06-17613,
06-18948


BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

MEMORANDUM BY PANELLA, J.            **FILED JULY 03, 2018**

In these consolidated cross-appeals, the parties appeal the judgment entered in the Court of Common Pleas of Montgomery County, which awarded Appellee/Cross-Appellant, Patriot Buick Pontiac GMC, Inc. (hereafter "Patriot"), judgment of $21,219.09, plus interest. We affirm the judgment in favor of Patriot. But we remand for the limited purpose of calculating and awarding prejudgment interest in favor of Patriot.

The relevant facts and procedural history of this case are as follows. Appellants/Cross-Appellees, Williams Pontiac Company and Bruce L. Sanft (collectively, "Appellants"), signed a contract with Jason Owens and Chad Helmer to act as executive managers of the Williams Pontiac Company's car dealership. Under the terms of the contract, Owens and Helmer were given control over the day-to-day operations of the business, including procurement of new vehicles and financing. The contract reflected the parties' intention for Owens and Helmer to eventually purchase the dealership. Completion of certain prerequisites, including the purchase of an associated Nissan

- 2 -

dealership by a separate entity, were to be concluded prior to the execution of a sale agreement.

Owens and Helmer formed Patriot, a Pennsylvania corporation, in anticipation of the sale. The parties extensively negotiated and signed the Asset Purchase Agreement, which included, among other things, Patriot's purchase of customer lists, new cars, certain used cars, accessories, shop equipment, and assignable leases. The agreement specifically excluded from the sale any Nissan assets, and money in Williams Pontiac Company's bank accounts. The parties also signed a non-compete agreement, and Patriot issued a promissory note to pay Appellant Sanft an additional $200,000.00 on top of the sale price, disbursed in 60 monthly installments.

One week before closing, Owens and Helmer provided Appellants with a trial balance sheet reflecting the value of Williams Pontiac Company's vehicles and parts. That balance sheet showed, among other things, trade-in vehicles valued at $1,021,289.00, accounts receivable at $689,329.08, and the company bank balance at $165,233.00. On March 7, 2006, the day of closing, Owens and Helmer provided an updated balance sheet, which all parties agreed to use to determine the relevant asset values. The updated balance sheet reflected trade-ins valued at $982,671.51, accounts receivable at $434,405.78, and a bank balance of $459,493.77. The parties settled on an amount owed by Patriot to Appellants at closing as $1,647,247.20, which included $401,363.25 to be paid by the General Motors Acceptance Corporation ("GMAC"), a vehicle financing company, as part of a financing

arrangement agreed to by all parties. The parties also agreed to offset the total by $8,720.68. Thus, Patriot paid Appellants $1,237,163.27 in cash and bank notes at closing.

Following closing, Appellants claimed they had not received the GMAC payment, and requested counsel for Patriot make inquiries as to its whereabouts. After doing so, counsel for Patriot determined the payment had already been deposited in Appellants' corporate bank account at the time of closing, and was thus part of the $459,493.77 bank balance Appellants retained.

In response, Appellants challenged counsel's representation that the GMAC deposit was part of the previously delivered bank balance. Unable to resolve the dispute, Appellants filed a complaint, arguing Patriot breached its contract by failing to pay the $401,363.25 still owed as part of the final cost. The complaint also averred fraudulent misrepresentation, negligent misrepresentation, conversion, and unjust enrichment, and requested judgment for $501,347.77, comprised of the remaining contract costs, plus alleged discrepancies in operating expenses, inventory valuation, and corporate stock tax. Appellant Sanft also filed a separate complaint for confession of judgment, claiming Patriot defaulted on its separate promissory note to pay him a total of $200,000.00 divided into monthly installments after the sale. Judgment by confession was entered for $208,500.30 on Appellant Sanft's complaint.

Patriot filed preliminary objections, which the court denied. Patriot then filed an answer, responding to Appellants' claims, asserting its own counterclaims, and asking for partial summary judgment. Patriot also filed a motion to strike or reopen the judgment entered in Appellant Sanft's favor, and requesting consolidation of the two complaints filed against it. The court granted the motion for consolidation, denied the motion for partial summary judgment, and ordered the judgment previously entered in favor of Appellant Sanft stricken without prejudice.

The parties proceeded to a five-day bench trial. At the conclusion of trial, the court ordered the parties to submit a post-trial statement and proposed findings of fact and conclusions of law, in lieu of presenting closing arguments to the court. On January 4, 2017, the court set forth its findings of fact and conclusions of law, ultimately finding in favor of Patriot. Afterward, the parties filed post-trial motions. The court denied and granted these in part, and entered judgment in favor of Patriot for $21,219.09. Appellants filed a notice of appeal, and Patriot filed a notice of cross-appeal.

Preliminarily, we note Appellants raise *eleven* issues in their appellate brief. Issue selection is a key hallmark of appellate advocacy. Justice Robert H. Jackson warned of the dangers of this shotgun approach many years ago:

> Legal contentions, like the currency, depreciate through overissue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at a lack of confidence in any one. Of course, I have not forgotten the reluctance with which a lawyer

> abandons even the weakest point lest it prove alluring to the same kind of judge. But experience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.

Ruggero J. Aldisert, J. "Winning on Appeal: Better Briefs and Oral Argument," at 130 (2d ed. 2003) (quoting Robert H. Jackson, "Advocacy Before the United States Supreme Court," 37 Cornell L.Q. 1, 5 (1951)). This "much quoted" advice, unfortunately, "often 'rings hollow'...." *Commonwealth v. Robinson*, 864 A.2d 460, 480 n.28 (Pa. 2004) (citing Ruggero J. Aldisert, J. "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982)). But its importance cannot be overstated. *See*, *e.g.*, *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983) ("Experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) ("[O]ne of the most important parts of appellate advocacy is the selection of the proper claims to urge on appeal. Throwing in every conceivable point is distracting to appellate judges, consumes space that should be devoted to developing the arguments with some promise, inevitably clutters the brief with issues that have no chance ... and is overall bad appellate advocacy."); Aldisert, *supra* at 129 ("When I read an appellant's brief that contains more than six points, a presumption arises that there is no merit to *any* of them.")

Nevertheless, we proceed by evaluating Appellants' arguments according to the following standard of review:

> Our appellate role in cases arising from nonjury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of the jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

***Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.***, 53 A.3d 53, 60-61 (Pa. Super. 2012) (citation and quotation marks omitted; brackets and ellipses in original). Also, the trial court, as the finder of fact, is free to believe "all, part[,] or none of the evidence presented." ***Ruthrauff***, ***Inc. v. Ravin, Inc.***, 914 A.2d 880, 888 (Pa. Super. 2006) (citation omitted). "Issues of credibility and conflicts in evidence are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." ***Id***. (citation and internal quotation marks omitted).

In their first issue, Appellants claim the $459,493.77 bank balance relinquished to Appellants' control at closing was in addition to the $1,647,247.20 purchase price. Appellants aver they would not have sold the

business if they realized the bank balance included $401,363.25 of the final purchase price. Appellants point to the decrease in value of the assets between the valuation sheet from February 28, 2006, and the March 7, 2006 closing checklist the parties agreed to use, as evidence that the purchase price was too low. Alternatively, Appellants argue even if the parties did not intend for the bank balance to supplement the purchase price, then Patriot still owes $401,363.25, as Patriot only paid $1,237,163.27 in cash and promissory notes if the bank balance is excluded. Appellants conclude this Court must reverse the trial court's finding in favor of Patriot on the breach of contract claim. We disagree.

Contract interpretation is a question of law; therefore, this Court is not bound by the trial court's interpretation. *See Kraisinger v. Kraisinger*, 928 A.2d 333, 339 (Pa. Super. 2007). "In construing a contract, the intention of the parties is paramount and the court will adopt an interpretation which under all circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished." *Charles D. Stein Revocable Trust v. General Felt Industries, Inc.*, 749 A.2d 978, 980 (Pa. Super. 2000) (citation omitted).

> In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if

we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

*In re Jerome Markowitz Trust*, 71 A.3d 289, 301 (Pa. Super. 2013) (citation omitted). When a contract is found to be ambiguous, "extrinsic or parol evidence may be considered to determine the intent of the parties." *Z & L Lumber Co. of Atlasburg v. Nordquist*, 502 A.2d 697, 700 (Pa. Super. 1985) (citations omitted). "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004) (citation omitted).

To establish a cause of action for breach of contract, a plaintiff must show: the existence of the contract, including its essential terms; a breach of duty imposed by the contract; and resultant damages. *See McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010).

To prove their breach of contract claim, Appellants presented evidence of a written contract to sell their business for $1,647,247.20. *See* Complaint,

filed 1/25/07, Asset Purchase Agreement, at 1-22. Appellant Sanft testified that $401,363.25 of the purchase price was to come from an agreement Owens and Helmer made on behalf of Patriot with GMAC, where GMAC would lend the money against the value of certain used cars. *See* N.T., Trial, 10/17/16, at 76. Appellant Sanft testified the GMAC money was to be directly wired into the company bank account relinquished to him at closing. *See id*., at 78. Appellant Sanft averred he believed the deposit would occur after closing, because Owens and Helmer were not supposed to apply for GMAC financing against used cars while in their capacity as executive managers. *See id*., at 146. He testified he did not realize at the time of closing that the anticipated deposit from GMAC was already reflected in the company's bank account. *See id*., at 77. He testified he would not have agreed to the $1,647,247.20 final purchase price if he knew the GMAC deposit was already in the bank account, since he expected to make over 2.1 million dollars from the sale. *See id*., at 81.

On cross-examination, Appellant Sanft admitted the executive manager agreement specifically allowed Owens and Helmer to borrow against cars using GMAC financing. *See id*., at 147; Complaint, filed 1/25/07, Management Agreement, at 4. Further, Appellant Sanft acknowledged that under this financing arrangement, Patriot accepted all of the liability for the used cars. *See* N.T. Trial, 10/18/16, at 6-7. And Appellant Sanft admitted he received

the GMAC deposit in his bank account.[1] *See id*., at 13; N.T. Trial, 10/17/16, at 200. Counsel for Patriot introduced a document Appellant Sanft signed, stating he had been paid for all of the assets purchased under the contract. *See* N.T., Trial, 10/18/16, at 17. Finally, Appellant Sanft conceded the cash in the bank account was not part of the Asset Purchase Agreement. *See id*., at 20. Nevertheless, Appellant Sanft testified, "everybody agreed" he would be "walking away with 2.1 million dollars" after closing. N.T., Trial, 10/17/16, at 81.

Based on the foregoing, we agree with the trial court that Appellants failed to prove a breach of duty imposed by the contract occurred here. The contract expressly excluded the assets in the bank from the purchase price. *See* Complaint, filed 1/25/07, Asset Purchase Agreement, at 5. The contract required Patriot to relinquish the bank balance to Appellants' control. Patriot did so. Appellant Sanft himself conceded Patriot delivered him exclusive access to the bank account, as required by the contract. Appellant Sanft also admitted the bank balance was left out of the listed purchase price.

Appellants' claim that the bank balance was an integral part of the agreement is belied by the terms of the contract. Also, Appellant Sanft's testimony concedes the GMAC payment was deposited into the bank account,

---

[1] The bank balance, which was introduced into evidence by a printout of the deposits and withdrawals on the account, actually reflects a GMAC deposit of $390,829.14. The shortfall is due to the twice-counted value of a SmartAuction car erroneously credited to Patriot. The trial court's order reflects a credit to Appellants for this discrepancy.

as the parties agreed. *See* N.T., Trial, 10/18/17, at 13; N.T., Trial, 10/17/16, at 200. Thus, Appellants have failed to prove a breach of duty imposed by the contract, and are due no relief on this issue.

Appellant's second breach of contract issue regards an alleged shortfall in Patriot's payment for the parts inventory. Appellants maintain the difference between the parts inventory reflected on the balance sheet provided at closing and the excluded value of the Nissan parts was $133,112.25. Appellants contrast this to the parts inventory column on the Asset Purchase Agreement's closing checklist, which reflects a final cost of $82,305.61 after Patriot chose not to buy certain obsolete parts. Appellants demand $33,715.00, which they assert is the difference between the parts and accessories Patriot retained, and what Appellants were paid for those parts.

The terms of the Asset Purchase Agreement state that at the time of the sale, Patriot was obligated to buy from Appellants all of the parts purchased since October 1, 2004, when Owens and Helmer began acting as executive managers. *See* Complaint, filed 1/25/07, Asset Purchase Agreement, at 4. Patriot had the option to purchase parts stocked before October 1, 2004. *See id*. The agreement compels the parties to use the GM Franchisor Parts restocking guide to determine the value of the parts. *See id*. The agreement also includes the following provision: "If at Closing, Buyer and Seller cannot agree on the value of the GM Franchisor Parts they shall engage an independent inventory service. The cost of the inventory service shall be

shared equally by Buyer and Seller." *Id*., at 9-10. The contract directed the inventory, if commissioned, to be taken the Saturday before the closing date.

Here, the parties engaged an independent inventory service, Straub's Inventory Control, Inc. Straub's conducted the inventory on Sunday, March 5, 2006, two days before closing. The inventory service valued all the parts the company owned at $99,397.24. Patriot elected not to buy $17,091.63 of those parts stocked before October 1, 2004, for a total of $82,305.61 in parts purchased. This number is reflected on the closing checklist, and in the final purchase price.

Appellants' bald allegation that the book value of the parts was actually $133,112.25 is irrelevant. The contract explicitly provides for settlement of discrepancies in the value of parts by an independent inventory service. Appellants do not contend that Straub's was not an independent inventory service, but rather that the value of the parts increased by over $30,000 between when Straub's conducted its inventory two days before closing, and when the trial balance sheet was printed. However, under the terms of the contract, the valuation from the inventory service is the final assessment. Consequently, Appellants are due no relief on this claim.

Appellants' third claim challenges the trial court's finding that the operating loss for the Williams Pontiac Company was $30,154.76 for the first week of March 2006. Appellants' ninth claim argues the court failed to apply their suggested offsets to Patriot's counterclaims. Simply, Appellants ask us to reweigh the evidence presented at trial about the company's operating

losses and Appellants' offsets, and instead find in their favor. As stated above, we will not substitute our judgment for that of the trial court in its capacity as the fact-finder. **See Ruthrauff**, **Inc.**, 914 A.2d at 888.

Appellants next advance a claim that the trial court improperly admitted hearsay evidence on the basis of the business records exception.

With regard to the admissibility of evidence,

> a trial court has broad discretion … and is not required to exclude all evidence that may be detrimental to a party's case. Such rulings on the admission of evidence will not be overturned by this Court absent a conclusion that the law has been overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record.

**Schuenemann v. Dreemz, LLC**, 34 A.3d 94, 102 (Pa. Super. 2011) (citations omitted).

Rule 803 of our Rules of Evidence concerns the business record exception to the hearsay rule and provides, in pertinent part, as follows.

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> …
>
> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business," which term includes business, institution, association, profession, occupation,

- 14 -

and calling of every kind, whether or not conducted for profit;

(C)    making the record was a regular practice of that activity;

(D)    all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)    the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

…

Pa.R.E. 803(6).

Mary Ritter, Patriot's financial comptroller and Williams Pontiac Company's former bookkeeper, testified at trial. She told the court she used a car dealership bookkeeping system referred to as "Reynolds and Reynolds," where she tracked all of Patriot's incoming and outgoing financial transactions. *See* N.T., Trial, 10/25/16, at 16. Ritter testified she created a record of these transactions within the Reynolds and Reynolds system, which Patriot introduced as Defense Exhibit 25. *See id*. Ritter authenticated these documents as business records, testifying she had personal knowledge of each transaction and recorded these contemporaneously as her regular practice in the ordinary course of business. *See id*., at 22. She also testified the records could not be changed, once entered into the Reynolds and Reynolds system. *See id*., at 23. Thus, the court properly admitted Defense Exhibit 25 as a business record.

To the extent Appellants challenge the record's support for Defense Exhibit 25, that contention goes to the weight of the evidence, not its validity as a business record. Appellants did not preserve any claim regarding the weight of the evidence in their Rule 1925(b) statement. Accordingly, it is waived. **See Lineberger v. Wyeth**, 894 A.2d 141, 148 (Pa. Super. 2006) ("An appellant's failure to include an issue in his Rule 1925(b) statement waives that issue for purposes of appellate review.")

Appellants next contest the court's dismissal of their negligent misrepresentation claim pursuant to the economic loss rule and the gist of the action doctrine. Additionally, Appellants challenge the trial court's dismissal of their unjust enrichment claim. Neither claim has merit.

"Pennsylvania law generally bars claims brought in negligence that result solely in economic loss." **Gongloff Contracting, L.L.C. v. L. Robert Kimball & Associates, Architects and Engineers, Inc.**, 119 A.3d 1070, 1076 (Pa. Super. 2015) (citation omitted). And Pennsylvania courts have long recognized the gist of the action doctrine, which operates to keep breach of contract and negligence claims as separate and distinct causes of action. **See Pittsburgh Const. Co. v. Griffith**, 834 A.2d 572, 581-582 (Pa. Super. 2003). In essence, the doctrine draws a line between tort actions, which are based upon breaches of duties imposed as a matter of social policy, and contract actions, which are based upon breaches of duties imposed by mutual consensus. **See id**., at 582. The doctrine's purpose is to preclude a plaintiff from recasting ordinary breach of contract claims into tort claims. **See id**. The

application of the doctrine is an issue of law. *See eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 15 (Pa. Super. 2002).

"A claim for unjust enrichment arises from a quasi-contract. A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *Stoeckinger v. Presidential Financial Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008) (citation and internal quotation marks omitted). "[W]e may not make a finding of unjust enrichment … where a written or express contract between parties exists." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999) (citation omitted).

Appellants present an ordinary breach of contract claim, premised on the existence of a written contract. Despite best efforts, Appellants' indelicate attempts to shoehorn that claim into various other legal theories for relief are unavailing. Appellants failed to present meritorious claims for either negligent misrepresentation or unjust enrichment. As such, the trial court properly dismissed both claims.

Appellants also contest the trial court's decision to grant Patriot's motions for compulsory nonsuit on Appellants' claims for intentional misrepresentation and conversion.

A court may enter a compulsory nonsuit on any and all causes of action if at the close of the plaintiffs' case against the defendant on liability, the court finds the plaintiffs have failed to establish a right to relief. *See* Pa.R.C.P.

230.1(a)(b). "On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with [Appellants] receiving the benefit of every reasonable inference and resolving all evidentiary conflicts in [their] favor." **Baird v. Smiley**, 169 A.3d 120, 124 (Pa. Super. 2017) (citations and internal quotation marks omitted).

> Intentional misrepresentation occurs when a party makes
>
> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

**Bortz v. Noon**, 729 A.2d 555, 560 (Pa. 1999) (citation omitted). Meanwhile, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." **HRANEC Sheet Metal, Inc. v. Metalico Pittsburgh, Inc.**, 107 A.3d 114, 119 (Pa. Super. 2014) (citations and internal quotation marks omitted).

Even giving Appellants the benefit of every reasonable inference, neither claim has merit. Appellants wholly failed to prove Patriot made a material misrepresentation, because the bank account balance was not material to the Asset Purchase Agreement. Further, Appellants did not prove intent to mislead. Likewise, Appellants' conversion claim fails. Appellants expressly gave consent to the transfer of the dealership when they signed the Asset

Purchase Agreement. Thus, the court properly entered nonsuit on these frivolous claims.

Finally, Appellants, as well as Patriot in its cross-appeal, claim the court erred by failing to award prejudgment interest on their claims.

We review the trial court's denial of prejudgment interest for abuse of discretion. **See Cresci Const. Services, Inc. v. Martin**, 64 A.3d 254, 258 (Pa. Super. 2013). "[A] court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others." **Id**. (citation omitted). Prejudgment interest is a matter of right where the amount may be determined from the contract. **See Ely v. Susquehanna Aquacultures, Inc.** 130 A.3d 6, 15 (Pa. Super. 2015). "If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due *less all deductions to which the party in breach is entitled*." **Id**., at 16 (quoting Restatement (Second) of Contracts § 354 (1981)) (emphasis added).

Here, the court found Appellants were entitled to breach of contract damages against Patriot in the following amounts: $11,745.00, for the value of a SmartAuction car erroneously credited to Patriot; $30,154.76, for operating losses incurred in the week before closing;[2] and $4,401.00, for

_____

[2] Patriot raises one other issue in its cross-appeal: whether it can be held liable for the operating loss debt in the first week of March 2006, incurred by Owens

capital stock tax. Additionally, the court found Patriot owed Appellant Sanft $157,693.32, after Patriot breached its agreement to pay Sanft $200,000.00 as consideration for signing the non-compete clause in the Asset Purchase Agreement. Based on these findings, Patriot owed Appellants $203,994.08.

However, the court determined Appellants also breached the Asset Purchase Agreement. Appellants owed Patriot $163,296.95 for accounts receivable, discussed above, and $61,916.22 for used cars paid for in the Asset Purchase Agreement that were not delivered, for a total of $225,213.17. Because Appellants were deemed jointly and severally liable for this amount, the court offset the award by the money Patriot owed Appellants, for a total of $21,219.09 owed to Patriot.

Because Appellants are not entitled to any net award after their losses are offset, they are consequently ineligible for interest or attorney's fees.

---

and Helmer as part of the management agreement. Patriot cites to **RKO-Stanley Warner Theatres, Inc. v. Graziano**, 355 A.2d 830 (Pa. 1976), for the proposition that a promoter cannot incur liability on behalf of an anticipated corporation, *unless* the corporation later expressly adopts those obligations.

Here, Patriot has done precisely that. The Management Agreement is threaded with language in anticipation of the Asset Purchase Agreement. By turn, the Asset Purchase Agreement specifically makes the buyer, Patriot, responsible for decisions made and obligations incurred by the managers under the Management Agreement. **See** Complaint, filed 1/25/07, Asset Purchase Agreement, at 1, 2, 4, 5, 7, 16, and 18. Thus, the court properly found Patriot liable for the operating loss debt incurred under the Management Agreement. **See** Trial Court's Findings of Fact/Conclusions of Law, filed 1/4/17, at 16.

Patriot, as the judgment winner in a breach of contract dispute, is entitled to prejudgment interest. *See Ely*, 130 A.3d at 15.

Accordingly, we affirm the judgment entered in favor of Patriot. But we remand for the limited purpose of calculating and awarding prejudgment interest in favor of Patriot.

Judgment affirmed. Case remanded for computation and awarding of prejudgment interest. Jurisdiction relinquished.

Judge Dubow joins the memorandum.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/3/18